# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

# MIAMI DIVISION

|  |  |
|---|---|
| EXPRESS FREIGHT INTERNATIONAL, EFI EXPORT & TRADING CORP., MARDERS, and REDLANDS OFFICE CLEANING SOLUTIONS, LLC, on behalf of themselves and all others similarly situated, | CASE NO. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| HINO MOTORS, Ltd., TOYOTA MOTOR CORPORATION, HINO MOTORS MANUFACTURING U.S.A., Inc., and HINO MOTORS SALES U.S.A., Inc. | |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    NATURE OF THE ACTION ........................................................................1

III.   PARTIES .......................................................................................................5

       A.   Plaintiffs ...........................................................................................5

       B.   Defendants ........................................................................................8

IV.    JURISDICTION AND VENUE ....................................................................9

V.     FACTS COMMON TO ALL COUNTS.......................................................16

       A.   The Emissions and Fuel Economy Scheme in the Class Trucks ..........................16

            1.   Defendants deceived consumers, businesses, and regulators
                 about the true emissions of the Class Trucks...........................................16

                 a.   *SCR Emissions Fraud: Hino altered the
                      engines it tested, thereby falsifying emissions
                      data for the Class Trucks.* .................................................16

                 b.   *Fuel Efficiency Fraud: Hino altered testing
                      instruments, resulting in inflated and false
                      fuel economy results for the Class Trucks.* ......................21

                 c.   *The Class Trucks contain defective OBD
                      systems that lead to excess emissions and
                      costly, avoidable repairs.* ...............................................24

            2.   Hino and Toyota knew for years about fraud in connection
                 with the emissions systems and fuel economy performance
                 in the Class Trucks.................................................................25

            3.   Hino—like all vehicle manufacturers—was subject to
                 specific regulations governing fleet-wide $CO_2$ emissions and
                 vehicle-specific $NO_x$ emissions. ...........................................27

                 a.   *Fleet-wide $CO_2$ regulations*................................................27

                 b.   *Effect on Fuel Economy Ratings*.........................................28

                 c.   *$NO_x$ regulations*................................................................29

       B.   Defendants' advertising featured inflated fuel economy ratings,
            false promises of environmental friendliness, and
            misrepresentations of high engine performance. ..................................30

VI.    CLASS ACTION ALLEGATIONS ............................................................40

       A.   Numerosity: Federal Rule of Civil Procedure 23(a)(1) ...............41

       B.   Commonality and Predominance: Federal Rule of Civil Procedure
            23(a)(2) and 23(b)(3) .........................................................................42

       C.   Typicality: Federal Rule of Civil Procedure 23(a)(3)....................42

       D.   Adequacy: Federal Rule of Civil Procedure 23(a)(4) ...................43

       E.   Declaratory and Injunctive Relief: Federal Rule of Civil Procedure
            23(b)(2) .............................................................................................43

       F.   Superiority: Federal Rule of Civil Procedure 23(b)(3)..................43

VII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ..........44

# TABLE OF CONTENTS

## (continued)

A. Discovery Rule Tolling.................................................................................44

B. Tolling Due to Fraudulent Concealment.........................................................44

C. Estoppel.........................................................................................................45

VIII. CAUSES OF ACTION ...................................................................................46

A. Claims Asserted on Behalf of the Nationwide Class ...........................................46

NATIONWIDE COUNT I: FRAUD BY CONCEALMENT
(Common Law) ............................................................................................46

B. Claims Asserted on Behalf of the State-Specific Classes .....................................48

FLORIDA COUNT I: Violations of the Florida Unfair & Deceptive
Trade Practices Act Fla. Stat. § 501.201, *et seq.* (On Behalf of the
Florida State Class).......................................................................................48

FLORIDA COUNT II: Breach of Express Warranty F.S.A. §§
672.313 and 680.21 (On Behalf of the Florida State Class) ...................................50

FLORIDA COUNT III: Breach of Implied Warranty of
Merchantability F.S.A. §§ 672.314 and 680.212 (On Behalf of the
Florida State Class).......................................................................................54

ARIZONA COUNT I: Violations of the Arizona Consumer Fraud
Act Ariz. Rev. Stat. § 44-1521, *et seq.* (On Behalf of the Arizona
State Class)..................................................................................................55

ARIZONA COUNT II: Breach of Express Warranty Ariz. Rev. Stat.
§§ 47-2313 and 47-2A210 (On Behalf of the Arizona State Class) .....................57

ARIZONA COUNT III: Breach of Implied Warranty of
Merchantability Ariz. Rev. Stat. §§ 47-2314 and 47-2A212 (On
Behalf of the Arizona State Class)..................................................................60

CALIFORNIA COUNT I: Violation of California Consumers Legal
Remedies Act Cal Bus. & Prof. Code § 1750, *et seq.* (On Behalf of
the California State Class) .............................................................................61

CALIFORNIA COUNT II: Violations of the California Unfair
Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.* (On
Behalf of the California State Class) ...............................................................63

CALIFORNIA COUNT III: Violations of the California False
Advertising Law Cal. Civ. Code § 17500 *et seq.* (On Behalf of the
California State Class) ..................................................................................64

CALIFORNIA COUNT IV: Breach of Express Warranty Cal. Com.
Code §§ 2313 and 10210 (On Behalf of the California State Class)...................65

CALIFORNIA COUNT V: Breach of Implied Warranty of
Merchantability Cal. Com. Code §§ 2314 and 10212 (On Behalf of
the California State Class) .............................................................................69

CALIFORNIA COUNT VI: Violation of Song-Beverly Consumer
Warranty Act, Breach of Implied Warranty Cal Civ. Code § 1790, *et
seq.* (On Behalf of the California State Class).................................................70

# TABLE OF CONTENTS

### (continued)

CALIFORNIA COUNT VII: Violation of the Song-Berverly Consumer Protection Act, Breach of Express Warranty Cal Civ. Code § 1790, *et seq.* (On Behalf of the California State Class)............................72

CALIFORNIA COUNT VIII: Breach of Express California Emissions Warranties Cal. Civ. Code § 1793.2, *et seq.* (On Behalf of the California State Class) ...........................................73

CALIFORNIA COUNT IX: Failure to Recall/Retrofit (On Behalf of the California State Class) .........................................75

CONNECTICUT COUNT I: Violations of Connecticut Unlawful Trade Practice Act Conn. Gen. Stat. § 42-110a, *et seq.* (On Behalf of the Connecticut State Class) .....................................75

CONNECTICUT COUNT II: Breach of Express Warranty Conn. Gen. Stat. Ann. § 42A-2-313 (On Behalf of the Connecticut State Class)...............................................................78

CONNECTICUT COUNT III: Breach of Implied Warranty of Merchantability Conn. Gen. Stat. Ann. § 42A-2-314 (On Behalf of the Connecticut State Class) .....................................81

NEW YORK COUNT I: Violations of the New York General Business Law § 349 N.Y. Gen. Bus. Law § 349 (On Behalf of the New York State Class)...........................................82

NEW YORK COUNT II: Violations of the New York General Business Law § 350 N.Y. Gen. Bus. Law § 350 (On Behalf of the New York State Class)...........................................84

NEW YORK COUNT III: Breach of Express Warranty N.Y. U.C.C. Law §§ 2-313 and 2A-210 (On Behalf of the New York State Class) ...................................................................86

NEW YORK COUNT IV: Breach of Implied Warranty of Merchantability N.Y. U.C.C. Law §§ 2-314 and 2A-212 (On Behalf of the New York State Class)...........................................89

IX.    REQUEST FOR RELIEF ...........................................90

X.    DEMAND FOR JURY TRIAL ...........................................92

## I.      INTRODUCTION

Plaintiffs Express Freight International, EFI Export & Trading Corp., Marders, and Redlands Office Cleaning Solutions, LLC, individually and on behalf of all others similarly situated (the "Classes"), allege the following against Hino Motors, Ltd., ("Hino Motors"), Hino Motors Manufacturing U.S.A., Inc., ("HMM") and Hino Motors Sales U.S.A., Inc. d/b/a Hino Trucks ("Hino Trucks") (together, "Hino"), and Toyota Motor Corporation ("Toyota") (collectively, "Defendants"), based, where applicable, on personal knowledge, information and belief, public corporate admissions, and the pre-filing investigation of counsel.

## II.     NATURE OF THE ACTION

1.      This case concerns a now-pervasive problem in the automotive industry: automakers' schemes to make it seem like their vehicles have lower emissions and better fuel economy than they actually do. As with other well-known instances of emissions fraud—the Volkswagen "Clean Diesel" case; the Fiat Chrysler "EcoDiesel" case; the "Audi $CO_2$" gasoline case; the Mercedes-Benz BlueTEC case; and the data manipulation scandals by Japanese automakers Mitsubishi Motors, Suzuki, Mazda, and Yamaha are a few examples[1]—Plaintiffs allege that Defendants in this case illegally manipulated emissions and fuel economy test results for Hino-branded trucks in the United States.

2.      This latest scheme involves tens of thousands of Hino trucks sold in the United States with hidden defects that increased their toxic emissions beyond what the law allowed and what owners and lessees bargained for. Plaintiffs understand that the scheme covers, at a minimum, all model year 2004-2021 trucks sold in the United States that contain a Hino A05C, A09C, E13C, NO4C, J05D, J05E or J08E diesel engine, including but not limited to the following models: Hino 155, 195, 238, 258, 268, 338, M series, L series and XL series (the "Class Trucks"). As a result of Defendants' scheme, referred to herein as the "Emissions and Fuel Economy Scheme," the Class

---

[1] *See, e.g.*, Eri Sugiura, *Toyota Truck Unit Shares Plunge After it Admits Cheating on Emissions Data*, Financial Times (March 7, 2022), https://www.ft.com/content/243e3fce-218c-4629-9c7c-6d494f3f1cdd.

Trucks delivered worse fuel economy on the road than during regulatory testing and emitted more pollution than permitted by law. This scheme damaged purchasers and lessees of these trucks who, among other things, paid for more fuel than they would have had these trucks achieved the represented fuel economy.

3.      This latest fraud was publicly revealed in a series of press releases beginning on March 4, 2022, in which Hino admitted to "misconduct" related to false emissions measurements and incorrect fuel economy performance in its applications for certification to sell vehicles in Japan from as far back as 2016.[2] In the same release, Hino admitted that it also had identified "potential issues regarding certification testing … for the North American market." *Id*. After Hino reported these "potential issues" to U.S. regulators, Hino explains, the U.S. Department of Justice commenced an investigation. *Id*. In an unusually frank admission, Hino suggested that, as with Volkswagen in the "Clean Diesel" scandal, the company had prioritized "internal pressures to achieve certain targets and . . . schedules" over honesty with its customers and regulatory compliance. *Id*. Likewise, a subsequent Hino press release in August 2022 attributed the misconduct to "management's . . . creating an environment and mechanism prioritizing meeting schedules and numerical goals over due processes."[3]

4.      It has recently come to light that even Hino's public admissions in March 2022 did not disclose the full story. A report from a Special Investigation Committee of outside experts convened in the wake of Hino's admissions has found evidence of "long-term misconduct concerning applications for engine certification" dating as far back as 2003, more than a decade earlier than Hino had earlier admitted. *Id.*

5.      Hino was aware of its misconduct, and its impact on trucks sold in the U.S., long before its public admission in March 2022. Indeed, Hino announced in December 2020 that it

---

[2] *See Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[3] *See Investigation Results by the Special Investigation Committee – Hino Press Release* (August 2, 2022),
https://www.hino-global.com/corp/news/assets/e9e9de2a2a41bb0b5079f138f042b1a3.pdf.

would pause production of trucks in North America until the end of September 2021, due to "challenges in the required U.S. engine certification testing process for new model years of the A09C, J08E, and J05E engines for North America" which were used in at least the Hino 155, 195, 238, 258, 268 and 338 models.[4] This conduct strongly suggests that Hino knew that its engines could not meet—and likely were not meeting—U.S. standards.

6.      Broadly speaking, Defendants' fraudulent scheme involved at least three practices. The first scheme was that during regulatory emissions testing, Defendants used materially different hardware in testing than what they used in Class Trucks sold and leased to customers. This is defined and described in more detail below as the "SCR Emissions Fraud." In its March 2022 press release, for example, Hino admitted that during an "emissions performance test" for its A05C (HC-SCR) medium-duty engine it had "replaced" the Selective Catalytic Reduction ("SCR") system—a part in the emissions after-treatment system known colloquially as the second muffler—and "continued" the test "using the replaced" SCR.[5] Hino did this because the vehicle's SCR system was not doing its job, and the vehicle's "emissions performance" was "deteriorat[ing]" as a result of sulfur accumulation that adheres to the HC-SCR catalyst. Hino was not able to achieve desired or lawful emissions targets using the SCR system actually installed in the trucks sold and leased to the Class.

7.      Other reports also indicate that during emissions testing of the A05C (HC-SCR) medium-duty engine and the A09C and E13C heavy-duty engines, Hino used "non-stock exhaust systems"—*i.e.*, something other than the exhaust systems equipped in the production trucks—to

---

[4] *Production Pause at Hino's North American Plants – Letter by Hino's President & CEO Yoshio Shimo* (December 23, 2020),
https://www.hino-global.com/corp/for_investors/disclosure/Production%20Pause%20at%20Hino %27s%20North%20America%20Plants.pdf.

[5] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022),
https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf ("Hino discovered that, in a durability test for emissions performance, which is one of the engine certification tests, the second muffler of the emissions after-treatment system was replaced during the test and the test was continued using the replaced muffler.").

achieve the required test results.[6] Although the information Hino publicly provided about this fraud was for certification of engines for the Japanese market, similar technology and testing was used for the Hino engines sold in the United States. Hino knew that the Class Trucks were equipped with SCRs that would have failed the emissions testing without the Defendants' manipulation, and that the Class Trucks were illegal to import or sell in the United States.

8.      Defendants' second scheme involved faking fuel economy test results and manipulating testing to yield false results that "appear[ed]" more "advantageous" than they actually were. As with the SCR Emissions Fraud, Hino admitted that it altered the fuel rate calibration value of the dynamometer panel (the device used for measuring the engine's power) for certain trucks in certification testing in Japan, including those equipped with A09C (Urea-SCR) or E13C (Urea-SCR) heavy-duty engines, and with N04C (Urea-SCR) light-duty engines. The purpose of this manipulation was to obtain fuel economy readings that "appear advantageous"[7]—*i.e.*, to create the false appearance that the Class Trucks obtained better fuel economy than they actually do. Although Hino admitted to using this fuel economy trick only in the Japanese certification process, Hino engaged in the same or similar fraud for trucks sold in the United States. Indeed, one of the engines included in Hino's admission—the A09C engine—was sold in the U.S. market but was subject to a "stop sale" in North America in 2020 and has not since been re-introduced for production. Based on information and belief, Defendants faked $CO_2$ and fuel consumption certification test data for all Class Trucks.

9.      The third issue relates to a defect in the Class Trucks' diagnostic hardware and software which both fail to detect malfunctions in the emissions systems, resulting in the Class Trucks emitting more pollution than permitted by law and requiring unnecessary and expensive maintenance. Each Class Truck contains an onboard diagnostic system ("OBD") that, when

---

[6] *See* Julian Buckley*, Hino Admits Falsifying Emissions Test Results*, Diesel Progress (March 11, 2022),
https://www.dieselprogress.com/news/hino-admits-falsifying-emissions-test-results/8018869.article.
[7] *See Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022),
https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

functioning correctly, monitors emissions and detects emissions control system failures. United States emissions regulations require the OBD system to warn the driver when too much soot and particulate matter has accumulated in the diesel particulate filter ("DPF") and to instruct the driver to drive on a highway or idle the vehicle to initiate a chemical filter-cleaning process that burns off the excess soot in the DPF. But in the Class Trucks, the OBD does not timely inform drivers to idle the Class Trucks to initiate cleaning. As a result, toxic soot and particulate matter clog the filter, releasing dangerous particulates into the air, reducing fuel economy, and requiring costly maintenance on the Class Trucks, often outside of the warranty.

10.     Plaintiffs and the proposed Class seek to enjoin Defendants' deceptive conduct and recover the economic damages they suffered as a result of Defendants' fraudulent conduct.

## III.    PARTIES

### A.    Plaintiffs

11.     Plaintiff **Express Freight International** (for purpose of this paragraph, "Plaintiff") is in the freight business. Plaintiff is a Florida corporation with its principal place of business in Miami, Florida. Plaintiff owns two Hino trucks: a 2016 Hino 268 and a 2017 Hino 268. Plaintiff decided to purchase the Class Trucks based in part on Hino's representations that they had high fuel economy. Plaintiff also purchased the Class Trucks under the assumption that they met or exceeded all regulatory emissions standards. Plaintiff purchased both Class Trucks new from TruckMax in Miami, Florida, and the prices Plaintiff paid were based on the value added by their purportedly high fuel efficiency and their ability to meet or exceed regulatory emissions requirements for their useful life. These representations, along with the advertised engine performance, were among the primary reasons Plaintiff chose the Class Trucks. At the time of purchase, Plaintiff did not know that its Class Trucks operated with materially worse fuel economy than was advertised. Plaintiff would not have purchased the Class Trucks, or would have paid less for them, had it known that they did not comply with emission standards; that their real-world fuel economy was significantly worse than advertised; and that their engines could not achieve the level of engine performance that was advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, including having to pay for more fuel during its possession of the trucks than it would have had they achieved the represented fuel economy, and being inconvenienced by having to refill the fuel tanks more often.

12.     Plaintiff **EFI Export & Trading Corp.** (for purpose of this paragraph, "Plaintiff") is in the export business. Plaintiff is a Florida corporation with its principal place of business also in Florida. Plaintiff owns a 2020 Hino 268. Plaintiff decided to purchase the Class Truck based in part on Hino's representations that it had high fuel economy. Plaintiff purchased the Class Truck under the assumption that it met or exceeded all EPA standards. Plaintiff purchased the Class Truck new from TruckMax in Miami, Florida, and the prices Plaintiff paid were based on the value added by its purported high fuel efficiency and its ability to meet or exceed regulatory emissions requirements for its useful life. These representations, along with the advertised engine performance were among the primary reasons Plaintiff chose the Class Truck. At the time of purchase, Plaintiff did not know that its Class Truck operated with materially worse fuel economy than was advertised. Plaintiff would not have purchased the Class Truck, or would have paid less for it, had it known that it did not comply with emission standards; that its real-world fuel economy was significantly worse than advertised; and that its engine could not achieve the level of engine performance that was advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including having to pay for more fuel during its possession of the truck than it would have had it achieved the represented fuel economy, and being inconvenienced by having to refill the fuel tanks more often.

13.     Plaintiff **Marders** (for the purpose of this paragraph, "Plaintiff") is a plant nursey, landscaping, and tree moving business. Plaintiff is a New York business with its principal place of business located in Bridgehampton, New York. Plaintiff purchased 13 Hino trucks—(for the purpose this paragraph, the "Class Trucks")—as follows: six Hino trucks purchased from Jukonski Truck Sales in Middletown, CT on or about December 27, 2016 (five trucks) and May 21, 2021 (one truck); six Hino trucks purchased from Gabrielli Truck Sales in Medford, NY on or about: October 27, 2017, September 18, 2018, April 2, 2019, January 8, 2019, January 22, 2021, and

October 19, 2021; and one Hino truck purchased from Gabrielli Truck Sales in Jamaica, NY on or about May 10, 2017. Plaintiff decided to purchase the Class Trucks based in part on Hino's representations that they had high fuel economy. Plaintiff purchased the Class Trucks under the assumption that they met or exceeded all regulatory emissions standards for their useful life. The prices Plaintiff paid for its Class Trucks were based on the value added by its purportedly high fuel efficiency and its ability to meet or exceed regulatory emissions requirements. These representations, along with the advertised engine performance, were among the primary reasons Plaintiff chose the Class Trucks. Indeed, Marders holds a strong commitment to the environment, including choosing to use organic practices in its landscaping work; the emissions performance was therefore important to Plaintiff's decision to purchase the Class Trucks.  At the time of purchase, Plaintiff did not know that its Class Trucks operated with materially worse fuel economy than was advertised. Plaintiff would not have purchased the Class Trucks, or would have paid less for them, had it known that they did not comply with emission standards; that their real-world fuel economy was significantly worse than advertised; and that their engines could not achieve the level of engine performance that was advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including having to pay for more fuel during possession of the trucks than it would have had they achieved the represented fuel economy, and being inconvenienced by having to refill the fuel tanks more often.

14.     Plaintiff **Redlands Office Cleaning Solutions LLC** (for purpose of this paragraph, "Plaintiff") is an office cleaning business. Plaintiff is a California business with its principal place of business also in California. Plaintiff owns two Hino vehicles: a 2016 Hino 268 and a 2019 Hino 268. Plaintiff decided to purchase the Class Vehicles based in part on Hino's representations that they had high fuel economy. Plaintiff purchased the Class Vehicles under the assumption that they met or exceeded all EPA standards. Plaintiff purchased the 2016 Hino 268 used in or around May 2021 from RWC Group in Phoenix, Arizona, and the 2019 Hino used in or around November 2021 from Enterprise Truck Sales in Sante Fe Springs, California, as is commonly done in the industry, and the prices Plaintiff paid were based on the value added by its purported high fuel efficiency and

its ability to meet or exceed regulatory emissions requirements for its useful life. These representations, along with the advertised engine performance were among the primary reasons Plaintiff chose the Class Vehicles. At the time of purchase, Plaintiff did not know that its Class Vehicles operated with materially worse fuel economy than was advertised. Plaintiff's owner, Alan Perez, who lives in Redlands, California, has noted that the Class Vehicles have poor fuel economy. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had it known that they did not comply with emission standards; that their real-world fuel economy was significantly worse than advertised; and that their engines could not achieve the level of engine performance that was advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including having to pay for more fuel during its possession of the vehicles than it would have had they achieved the represented fuel economy, and being inconvenienced by having to refill the fuel tanks more often.

### B.   Defendants

15.   **Hino Motors, Ltd.** ("Hino Motors") is a Japanese corporation with its principal place of business located in Tokyo, Japan. Hino Motors designs, develops, manufactures, and sells commercial vehicles—small, medium, and heavy-duty trucks and buses[8]—as well as diesel engines. Toyota Motor Corporation owns a controlling interest, 50.1%, of Hino Motors. Hino Motors engineered, designed, developed, manufactured, and installed the engines in Hino trucks and exported these trucks with the knowledge and understanding that they would be sold throughout the United States, including in Florida. On information and belief, Hino Motors also reviewed and approved the designs, testing strategies, marketing, and advertising campaigns designed to sell the Hino-branded Class Trucks in Florida and throughout the United States.

16.   **Hino Motors Manufacturing U.S.A., Inc.** ("HMM") is a Delaware corporation with its principal place of business located in Michigan at 45501 Twelve Mile Road, Novi, MI 48377. HMM is a wholly owned U.S. subsidiary of Hino Motors, and it engages in business,

---

[8] *See* 49 U.S.C. § 523 *et seq.* for vehicle classification definitions.

including the manufacturing, R&D, sales, and parts distribution, in all 50 states.[9]  HMM regularly submits applications to the EPA to obtain the certification necessary for the sale of Hino vehicles in the United States.[10] Hino Motors knew and approved of HMM's submissions, which were necessary for Hino Motors to export its products for sale in the United States.

17.     **Hino Motors Sales U.S.A., Inc.** ("Hino Trucks") is a Delaware corporation with its principal place of business located in Michigan at 45501 12 Mile Road, Novi, MI 48377. Hino Trucks is in the business of distributing, marketing, and selling automobiles. Hino Motors is the parent corporation of Hino Trucks. Upon information and belief, Hino Motors reviewed and approved Hino Trucks' advertising, sales strategies, engineering, purchasing, manufacturing, and marketing materials. Hino Trucks

18.     **Toyota Motor Corporation** ("Toyota") is a Japanese corporation with its principal place of business in Toyota City, Japan. Toyota is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. Toyota is the parent corporation of Hino. Upon information and belief, Toyota reviewed and approved Hino's vehicle designs, testing strategies, emissions compliance, and marketing materials.

**IV.     JURISDICTION AND VENUE**

19.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this is a proposed class action where at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

---

[9] *Hino Celebrates Grand Opening of New Manufacturing Facility – Hino Press Release*, About Hino Motors Manufacturing and Hino Trucks (Aug. 21, 2019), http://www.hmmusa.com/press20190821.html.

[10] *See, e.g.*, EPA's Manufacturer-Run-In-Use Testing Program Data for Heavy-Duty Diesel Engines for model years 2009 through 2017, https://www.epa.gov/compliance-and-fuel-economy-data/manufacturer-run-use-testing-program-data-heavy-duty-diesel (Hino reporting heavy-duty diesel engine testing data to the EPA in years 2009, 2012, 2013, 2014, 2015, and 2017).

20.     This Court has specific personal jurisdiction over Defendants pursuant to Florida Statute § 48.193(1)(a)(1) and (6). Defendants conduct substantial business in this District; some of the conduct giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on business in this state or having an office or agency in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state.

21.     The Defendants targeted consumers in each of the fifty states, including Florida, with advertising for the Class Trucks; purposefully directed their activities to the fifty states, including Florida; and controlled the design, distribution, and sale of the Class Trucks themselves. These contacts with the United States and Florida establish personal jurisdiction over each of the Defendants. This Court further has pendant personal jurisdiction over the claims of non-Florida Plaintiffs.

22.     As explained below, each of the Defendants purposefully directed their activities toward the United States, including Florida, and availed themselves of the privilege of conducting activities in the United States and Florida. Although Toyota and Hino Motors are based in Japan, they are subject to the Court's specific jurisdiction because they have pervasive contacts with the United States, including Florida, purposefully directed their activities to the United States, including Florida, and exert substantial control over their domestic subsidiaries, HMM and Hino Trucks.

23.     Defendants' contacts with the United States and Florida described herein were all in furtherance of marketing, selling, and leasing their vehicles in the United States. This marketing, selling, and leasing of the Class Trucks while concealing the emissions and fuel economy fraud related to those Trucks gives rise and relates to Plaintiffs' claims. In particular, the Florida Plaintiffs and consumers suffered economic harm, loss, and damages in Florida that arise out of and relate to purchasing and driving Class Trucks in Florida.

24.     Defendants are in the business of designing, developing, manufacturing, marketing, and selling trucks and buses including in the United States and Florida. Defendants sold thousands of Hino trucks in the United States in 2021 alone.[11]

25.     Florida is a significant market for Defendants; there are at least 12 Hino-authorized dealerships in Florida that sell and lease Hino-branded vehicles. Defendants Hino Trucks and Hino Motors created or controlled the distribution network that brought Class Trucks, including Plaintiffs', to the United States and Florida.  During the relevant time period, Hino Trucks continuously registered to do business in Florida and has appointed a registered agent in Florida. It most recently renewed its registration by filing an annual report on March 29, 2022, with the Florida Department of State, Division of Corporations, identifying CT Corporation System in Plantation, Florida as its registered agent.

26.     During the relevant period, Defendant Hino Motors manufactured Hino engines and vehicles in Japan and exported them for sale to the United States. During the relevant period, Defendant HMM assembled Hino vehicles in the United States as its plant in West Virginia.[12] Defendant Hino Trucks, in turn, distributed, marketed, and sold the vehicles manufactured by Hino Motors and HMM within the United States, including in Florida. In so doing, Hino Trucks regularly transported and distributed for sale numerous Class Trucks to authorized dealerships in Florida to facilitate their sale to consumers in Florida.

27.     For example, Defendants manufactured and then shipped Plaintiff Express Freight International's and Plaintiff EFI Export & Trading Corp.'s trucks to TruckMax Hino, an authorized Hino dealership in Miami. These types of transactions involving the importing and distribution of Class Trucks with defective engines, for Defendants' pecuniary benefit, occurred hundreds or

---

[11] Hino, *Consolidated Financial Highlights*, https://www.hino-global.com/corp/for_investors/financial_highlights.html (reporting 8,510 units sold in North America in FY21).
[12] HMM, *Mineral Wells, WV Truck Manufacturing Milestones/Timeline*, http://www.hmmusa.com/west-virginia.html

thousands of times during the relevant time period with respect to the sale of Class Trucks in Florida.

28.     Defendants also established channels for marketing Class Trucks and providing regular advice to owners and lessees of Class Trucks, including Plaintiffs, in the United States and this District by licensing trademarks to dealerships and authorizing dealerships to sell Hino -branded trucks and buses.

29.     The Class Trucks, including Plaintiffs' trucks, were the subject of advertising campaigns that were intended to reach and did reach Florida.  Those campaigns, created and paid for by Hino Trucks, advertised and promoted the fuel economy and emissions performance of the Class Trucks, and were controlled, directed, funded, and/or approved by its parent companies. Hino Trucks directed and approved the publication and distribution of these advertisements toward Florida consumers and Plaintiffs, with the intent and knowledge that they would reach consumers, including Class Members, in Florida, via print publications and the internet. None of these advertisements or marketing materials disclosed the emissions and fuel economy cheating in the Class Trucks.

30.     Hino Trucks also marketed Hino vehicles in Florida by regularly attending annual trade shows in Florida. For example, Hino Trucks attended the Florida Nursery Growers & Landscape Associate conference in Orlando in 2013, 2014, 2016 to promote its trucks. It also attended and had a booth at the Florida Tow Show in Orlando in at least each year from 2011-2022, apart from 2020 when the show was held virtually. In many of these years, Hino Trucks marketed its trucks and engaged in a promotion where it raffled off a Hino truck live during the event. In 2017, Hino Trucks presented a seminar at the Florida Tow Show in Orlando, about the "Insight Telematics" in its vehicles. Hino Trucks also entered into a partnership with Herc Rentals in Bonita Springs, Florida. Through this partnership, Herc Rentals offers Hinos for rent to consumers in Florida.

31.     During the relevant time period, Hino Truck's website (www.Hino.com) has been accessible and accessed in Florida by Class Members. This website, which is copyright to Hino

12

Trucks, solicited the sale of the Class Trucks and connected customers with Hino-authorized dealers in the United States, including in Florida.

32.     During the relevant time period, Hino Motor's website (www.Hino-global.com) in Japan has been accessible and accessed in Florida by Class Members. This website, which is copyright to Hino Motors, connected customers to Hino Trucks' website, which solicited the sale of the Class Trucks and provided information about authorized dealers in the United States, including in Florida.

33.     Hino's network of authorized dealers offers maintenance and repair services, thus fostering an ongoing relationship between Defendants and their customers in Florida. As alleged above, there are at least 12 Hino-authorized dealerships in Florida.

34.     Toyota purposely avails itself of markets in the United States, including Florida. For example, Toyota regularly submitted applications to obtain certification from the EPA that was necessary for the sale of Toyota vehicles in the United States, including Florida. Toyota manufactures vehicles that are imported and sold to the United States, including Florida.

35.     Toyota Motor Corporation's 2019 Annual Report acknowledges:

The North American region is one of Toyota's most significant markets. . . . In the North American region, of which the U.S. is the main market, Toyota has a wide product lineup (excluding large trucks and buses), and sold 2,745 thousand vehicles on a consolidated basis in fiscal 2019. This represents approximately 31% of Toyota's total unit sales on a consolidated basis. The U.S., in particular, is the largest market in the North American region, which accounts for 86% of the retail sales of Toyota in such region. Sales figures for fiscal 2019 were 97.8% of those in the prior fiscal year.

36.     Defendants, directly or indirectly through agreements with affiliated financial service providers, such as their partners Toyota Commercial Finance and Hitachi Capital America Corp, assisted in financing for the Class Trucks throughout the United States and this District.

37.     Hino Motors and Toyota, together with their U.S. subsidiaries, operate and hold themselves out to the public as unified brands of "Hino" and "Toyota" that cater to U.S. consumers and purposefully avail themselves of the United States market for Hino and Toyota-branded vehicles. As Hino itself describes, "under the HINO brand, we represent Toyota Group in the global

market for heavy-duty trucks and buses . . . We use the Toyota Production System to achieve continuing gains in productivity and in quality through our operations."[13] Hino Motors similarly describes itself to be a "Toyota Group Company."[14] Hino Trucks says the same thing.[15]





38.     For decades, Toyota and Hino Motors have continuously engaged in business in the United States, including Florida, by, among other things, controlling and interacting with their subsidiaries in the United States, including Florida. This business also included manufacturing Hino-branded vehicles and, together with the American subsidiaries, marketing, selling, and distributing those trucks in all 50 states and the District of Columbia (including Florida). HMM's and Hino Trucks' services on behalf of Hino Motors and Toyota are so important that Hino Motors and Toyota would perform those services themselves if the subsidiaries did not exist. In consumer transactions, like those with Plaintiffs, Hino's unified brands and logos serve as HMM's and Hino Trucks' official seal and signature to consumers.

---

[13] *About Hino Motors – Hino & the Toyota Group*,
https://www.hino-global.com/corp/about_us/hinoandtoyota.html.
[14] *About Hino Motors – Who We Are*, https://www.hino-global.com/corp/about_us/.
[15] https://www.hino.com/

39.     Toyota, Hino, and their U.S. subsidiaries share key executives. For example, Hino Trucks announced a new management structure in 2017 that "[brought] together a formidable knowledge of manufacturing from Hino globally."[16] This included the appointment of Yoshinori Noguchi as chairman of Hino Trucks. Mr. Noguchi was also the president and CEO of Hino Trucks. Prior to these appointments, Mr. Noguchi served on the board of Hino Trucks, while also serving as managing officer of Hino Motors in Japan.[17] Likewise, in 2017, Takashi Ono was appointed President of Hino Trucks, after previously holding "a number of domestic and international leadership positions over his 35-year career at Toyota Motor Corp." Prior to the appointment, Mr. Ono served as the Senior General Manager of Hino Motors in Japan.[18]

40.     During the relevant time period, Hino Motors has registered and maintained registrations with the United States government for trademarks associated with its Hino-branded vehicles, which it uses to identify and distinguish its vehicles and parts in the United States and this District.

41.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class members residing in this District, including Plaintiffs Express Freight International and EFI Export & Trading Corp. Defendants have marketed, advertised, sold, and leased the Class Trucks from authorized dealers located in this District, including TruckMax Hino in Miami.

---

[16] aftermarketNews Staff, *Hino Motors Manufacturing U.S.A. Announces New Management Structure*, aftermarketNews (April 7, 2017), https://www.aftermarketnews.com/hino-motors-manufacturing-u-s-announces-new-management -structure/.

[17] aftermarketNews Staff, *Yoshinori Noguchi Appointed President of Hino Trucks U.S.A.*, aftermarketNews (April 5, 2013), https://www.aftermarketnews.com/yoshinori-noguchi-appointed-president-of-hino-trucks-u-s-a/.

[18] aftermarketNews Staff, *Hino Motors Manufacturing U.S.A. Announces New Management Structure*, aftermarketNews (April 7, 2017), https://www.aftermarketnews.com/hino-motors-manufacturing-u-s-announces-new-management -structure/.

## V.   FACTS COMMON TO ALL COUNTS

### A.   The Emissions and Fuel Economy Scheme in the Class Trucks

#### 1.   Defendants deceived consumers, businesses, and regulators about the true emissions of the Class Trucks.

42.     Defendants' Emissions and Fuel Economy Scheme involved three practices: (a) using parts in regulatory testing that were materially different from parts installed in Class Trucks sold and leased to customers ("SCR Emissions Fraud"); (b) tampering with testing instruments to make the Class Trucks appear more fuel efficient than they actually were ("Fuel Efficiency fraud"); and (c) installing diagnostic systems in the Class Trucks that failed to timely initiate diesel particulate filter cleaning ("Defective OBD Systems").

#### a.   *SCR Emissions Fraud: Hino altered the engines it tested, thereby falsifying emissions data for the Class Trucks.*

43.     Diesel engines have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the higher the rate of emissions of harmful (and regulated) pollutants. Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do ("spark ignition"), diesel engines compress a mist of liquid fuel with longer hydrocarbon chains and air to very high temperatures and pressures, which causes the fuel/air mixture to auto-ignite and combust ("compression ignition"). This more powerful compression by the pistons can produce greater engine torque (that is, more power). Diesel engines can do this both because they operate at higher compression ratios than gasoline engines and because diesel fuel contains more energy than gasoline.

44.     But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions, including $NO_x$, and a variety of nitrogen and oxygen chemical compounds ($NO$, $NO_2$, etc.) that can form at high temperatures and pressures. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital and NOx is a component of and precursor chemical to the formation of ozone ("smog").

16

45.     Given the risks, these emissions are highly regulated, and minimizing $NO_x$ is paramount. Modern diesel trucks contain after-emissions treatment devices to reduce $NO_x$ emissions and comply with recent EPA emissions standards yet still produce almost half of all $NO_x$ emissions from on road vehicles. Most use a technology called "selective catalytic reduction" ("SCR"), a system that traps and treats exhaust gasses after they leave the engine but before they are released from the vehicle.  In most systems, once the gasses are trapped, the SCR systems inject a urea solution (called diesel exhaust fluid or DEF) into the exhaust stream, which reacts chemically with the $NO_x$, breaking it down into nitrogen, water, and small amounts of $CO_2$. An image illustrating the workings of a urea after-emissions treatment device is excerpted below.[19]



46.     The efficiency of the emissions after-treatment system greatly affects the vehicle's emissions levels. Vehicles with a well-functioning after-treatment system can reduce $NO_x$ emissions up to 90 percent.

47.     Hino admits that the SCR system it used for regulatory testing of certain engines sold in Japan and the United States differed materially from the SCR systems it installed in trucks that it produced and sold to its customers.[20] Specifically, during a long-term durability test for emissions performance (one of the required engine certification tests),[21] Hino intentionally

---

[19] Diesel Technology Forum, *What is SCR?*, Diesel Emissions Control System, https://www.dieselforum.org/about-clean-diesel/what-is-scr.

[20] *See Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[21] *See* 40 C.F.R. § 1066.410, "Dynamometer test procedure;" 40 C.F.R. § 86.1823-08, "Durability demonstration procedures for exhaust emissions;" *see also* EPA Vehicle Fuel and Emissions Testing, *Dynamometer Drive Schedules*,
*Footnote continued on next page*

replaced the SCR system mid-test. "This change was made after learning that emissions performance would deteriorate" to the point where, in Hino's own words, "the engine may not meet the regulatory emissions standards."[22] Unsurprisingly, when Hino conducted emissions durability re-testing on one of its medium-duty engines, it found that "this engine may exceed regulatory emissions standards over the course of the vehicle's full useful life."[23] This is because sulfur accumulates in Defendants' SCR systems and causes the SCR system to deteriorate prematurely. When that happens, the SCR can no longer convert the harmful chemicals as efficiently. In short, as the trucks sold to its customers are driven, its $NO_x$ emissions will continue to increase and eventually exceed regulatory standards.

48.     As discussed above, Hino informed the Japanese Ministry of Land, Infrastructure, Transport and Tourism ("MLIT") and the Ministry of Economy, Trade, and Industry ("METI") that it had engaged in potential misconduct in connection with at least four of its engines, including engines that were sold in Japan and the United States.

49.     MLIT ordered Hino to conduct a thorough investigation into its manipulation of emissions systems. MLIT also ordered Toyota, Isuzu, UD Trucks, and seven other heavy-duty truck manufacturers in Japan to launch their own investigations into the matter.

50.     On March 18, 2022, MLIT conducted an administrative hearing prior to imposing sanctions on Hino Motors, Toyota, and Isuzu, noting that the latter two parties were alleged to have fraudulently sold buses in Japan that were equipped with the Hino engines in question.[24]

51.     MLIT found that Hino had falsified the engine performance and fuel consumption measurements in certification tests of at least four Hino engines, and notified Hino that it would

---

*Footnote continued from previous page*
https://www.epa.gov/vehicle-and-fuel-emissions-testing/dynamometer-drive-schedules.
[22] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.
[23] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.
[24] MLIT Administrative Law Hearing (March 18, 2022), https://www.mlit.go.jp/report/press/jidosha08_hh_004384.html (open link in Chrome to use Google Translate for English translation).

revoke certification of these four engines.[25] As Chief Cabinet Secretary Hirokazu Matsuno said, "[t]he matter is extremely regrettable, as it greatly undermines the trust of automobile users."[26]

52.     On March 25, 2022, Hino submitted a statement to MLIT, announcing recalls of vehicles containing three of the four engines at issue: the A05C (HC-SCR), the A09C (Urea SCR), and the E13C (Urea SCR).[27] It has not recalled its N04C (Urea-SCR) engine at this time.

53.     Based on information and belief, Defendants engaged in the same or similar fraud vis-à-vis the Class Trucks sold in the United States. As one automotive reporter put it, the evidence suggests that "Hino supplied false numbers to the Japanese government, *and also to US regulators*."[28]

54.     Notably, Hino's public admissions of wrongdoing in Japan actually ***followed*** an internal audit of "potential issues regarding certification testing … of on-road engines for the North American market."[29]

55.     This audit appears to have been conducted as a result of an inquiry by U.S. regulators. According to reporting, U.S. authorities asked Hino in 2016 if it had discovered any "falsified emissions data."[30] At the time, Hino said "no."[31]

---

[25] Kim Kyung-Hoon, *Japan to Revoke Hino's Engine Certification Over False Emissions Data* Reuters (March 18, 2022), https://www.reuters.com/world/asia-pacific/japan-revoke-hinos-engine-certification-over-false-emissions-data-2022-03-18/.

[26] Kim Kyung-Hoon, *Japan Transport Ministry Raids Hino Motors After False Emissions Data, Shares Tumble*, Reuters (March 7, 2022), https://www.reuters.com/markets/europe/japan-transport-ministry-raids-hino-motors-after-false-emissions-data-shares-2022-03-07/.

[27] *Notice Regarding Misconduct concerning Engine Certification – Letter by Hino's President and Board Member Satoshi Ogiso* (March 4, 2022), https://www.hino-global.com/corp/for_investors/disclosure/assets/9279ee7164b8033be06e87497ecf235e.pdf.

[28] Thom Taylor, *Toyota Trucks Admits Diesel Emissions Cheating*, MotorBiscuit (March 8, 2022), https://www.motorbiscuit.com/toyota-trucks-admits-diesel-emissions-cheating/.

[29] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[30] Florin Amerlel, *Toyota's Hino Motors Has Falsified Emission Data Since 2016, Recalls Will Soon Start*, Autorevolution.com (March 6, 2022), https://www.autoevolution.com/news/toyota-s-hino-motors-has-falsified-emissions-data-since-2016-recalls-will-start-soon-183276.html.

56.     Likewise, and in the same year, as the Special Investigation Committee investigation Hino's misconduct concluded, Hino also engaged in "false reporting" to the MLIT following a request in 2016 to disclose any misconduct in emissions/fuel efficiency tests.[32]

57.     Despite these denials to U.S. and Japanese regulators, in 2018 U.S. authorities notified Hino that its trucks were not "up to standard."[33] On or around this time, Hino conducted an audit and submitted an "internal report of [Hino's] findings" to U.S. regulators. This report apparently did not satisfy the relevant American regulators, and "the U.S. Department of Justice commenced an investigation" after the report was delivered.[34]

58.     For obvious reasons, the Defendants' scheme was both deceptive and illegal. Vehicles and engines used in regulatory testing must be materially identical to those sold. *See* 42 U.S.C. § 7541(a)(3)(A) (explaining that it is prohibited "for any person to remove … any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations … prior to its sale and delivery to the ultimate purchaser").[35] The EPA issued Certificates of Conformity ("COCs") for the vehicles and engines as tested based on data provided by Hino, and not as ultimately sold and leased to customers. Accordingly, the vehicles affected by

---

*Footnote continued from previous page*

[31] Florin Amerlel, *Toyota's Hino Motors Has Falsified Emission Data Since 2016, Recalls Will Soon Start*, Autoevolution.com (March 6, 2022), https://www.autoevolution.com/news/toyota-s-hino-motors-has-falsified-emissions-data-since-2016-recalls-will-start-soon-183276.html.

[32] *See Investigation Results by the Special Investigation Committee – Hino Press Release* (August 2, 2022), https://www.hino-global.com/corp/news/assets/e9e9de2a2a41bb0b5079f138f042b1a3.pdf.

[33] Florin Amerlel, *Toyota's Hino Motors Has Falsified Emission Data Since 2016, Recalls Will Soon Start*, Autoevolution.com (March 6, 2022), https://www.autoevolution.com/news/toyota-s-hino-motors-has-falsified-emissions-data-since-2016-recalls-will-start-soon-183276.html.

[34] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[35] The EPA's Certificates of Conformity—which are required for every vehicle sold in the United States—also explain that the certificates cover "only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications that apply" to the vehicles that were tested. Similarly, CARB's Executive Orders—required for every vehicle sold in California—clearly state that "[p]roduction vehicles shall be in all material respects the same as those for which certification is granted."

the SCR Emissions Fraud emitted more NO$_x$ than represented and—because they were not actually covered by legitimate COCs and Executive Orders—were illegal to import or sell.

59.     Upon information and belief, this fraud affects at least the following Class Trucks: model year 2004 – 2021 Hino 155, 195, 258, 268, 338, M, L and XL and any other Hino and Toyota trucks containing the A05C, A09C, J05D, J05E or J08E diesel engines. As explained above, Plaintiffs' investigation into the facts and scope of the fraud at issue remains ongoing; recent reports from the Special Investigation Committee support that the fraud likely extends back much further than Hino originally admitted, to at least as early as 2003.[36]

**b.      *Fuel Efficiency Fraud: Hino altered testing instruments, resulting in inflated and false fuel economy results for the Class Trucks.***

60.     In addition to physically altering the trucks and engines it tested, Hino also fraudulently manipulated the fuel economy testing for Class Trucks to make them appear more fuel efficient in certification tests than they actually were.

61.     For the vast majority of vehicles sold in the United States, fuel economy ratings are derived from testing conducted in-house by the vehicle manufacturer. Although conducted by the manufacturer, the testing must follow EPA-regulated procedures designed to ensure accuracy. In a small number of cases, the EPA conducts confirmatory testing to ensure the reported figures are accurate, but the agency otherwise accepts the manufacturer's reporting and certification of its results.[37]

62.     For vehicles weighing more than 14,000 pounds—including the trucks at issue here—the EPA requires that manufacturers "demonstrate that [they] meet emissions standards using emission modeling." 40 C.F.R. § 1037.501(a). A manufacturer may use "fuel-mapping" or powertrain testing. *Id*.

---

[36] *Investigation Results by the Special Investigation Committee – Hino Press Release* (August 2, 2022), https://www.hino-global.com/corp/news/assets/e9e9de2a2a41bb0b5079f138f042b1a3.pdf.
[37] *U.S. Department of Energy, Office of Energy Efficiency & Renewable Energy: How Vehicles are Tested*, https://www.fueleconomy.gov/feg/how_tested.shtml.

63.     "Fuel mapping" determines fuel consumption and emissions by testing the engine at a variety of engine speeds and torque settings on an engine dynamometer. 40 C.F.R. § 1036.535 (regulations regarding fuel mapping and fuel consumption at idle); 40 C.F.R. § 1036.540 (regulations for highway cruising).

64.     Powertrain testing involves testing an engine along with other hardware components such as a transmission or drive axle on an engine dynamometer. 40 C.F.R. § 1037.550

65.     For the Class Trucks, while measuring fuel consumption in certification tests, Hino altered the fuel flow rate calibration value of the dynamometer panel to make it appear as though its trucks were more fuel efficient than they actually were.[38] Specifically, during the fuel consumption measurement for certification tests in Japan, Hino "commenc[ed] measurements of fuel consumption while the engine was idling before the fuel flow rate had stabilized" and adopted "the best figures from the results of multiple measurements."[39] In Hino's own words, "[t]his caused an altered value that was better than the actual value to be displayed on the fuel consumption meter," and "Hino has confirmed through a technical review that the actual fuel economy performance [of the affected engines] does not meet the reported value."[40]

66.     Again, while the specific admissions contained in Hino's press release address the Japanese certification process, Plaintiffs understand that Hino engaged in the same or similar fraud for the Class Trucks sold in the United States.

67.     Notably, one of the same engines that Hino admitted was the subject of false measurements for Japanese certifications tests—the A09C engine—was one of three engines that Hino voluntarily stopped using in North America in 2020. Hino formally paused the production of

---

[38] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[39] *Submission of a statement to the Ministry of Land, Infrastructure, Transport and Tourism and misconduct concerning the "N04C (Urea-SCR))" light-duty engine – Hino Press Release* (March 25, 2022),
https://www.hino-global.com/corp/news/assets/02e4daf5de0d8220ec977e893c3a59ce.pdf.

[40] *Misconduct concerning Engine Certification – Hino Press Release* (March 4, 2022), https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

all vehicles with A09C, J08E, and J05E engines in North America, purportedly following "challenges in the required U.S. engine certification testing processes for new model years of the A09C, J08E, and J05E engines for North America."[41] Based on information and belief, including Hino's admission that the Department of Justice is conducting an investigation regarding certification testing of trucks in the United States equipped with A09C engines, Hino engaged in the same falsifications of fuel economy testing values for vehicles equipped with A05C, A09C, JO8E, and JO5E engines in North America starting at least as early as 2004.

68.     The facts and scope of cheating on emissions and fuel economy in Hino trucks are unfolding in real-time. Indeed, an August 2, 2022 report from a commissioned Special Investigation Committee, comprised of outside experts convened to investigate the misconduct concerning Hino's engine certifications, found evidence of misconduct in Hino's emissions and fuel efficiency testing dating back to *at least 2003*, which was *significantly* earlier than Hino's previous public admissions.[42] As such, even in its public statements purporting to reveal its past misconduct, Hino continues to obscure the truth of its scheme.

69.     This scheme was also both deceptive and illegal. It is illegal to import or sell engines and vehicles that do not comply with 42 U.S.C. § 7541(a). *See* 42 U.S.C. § 7522(a)(4)(A). Section 7541(a) requires that the manufacturer's vehicles and engines, when properly maintained and used, meet air pollution emission standards. But the fuel economy data—and corresponding $CO_2$ emissions data—that Hino submitted to the regulators regarding the Class Trucks was false, and the Class Trucks' actual $CO_2$ emissions did not meet air pollution emissions standards. *See infra,* V.A.3, a-b.

---

[41] *Production Pause at Hino's North American Plants – Letter by Hino's President & CEO Yoshio Shimo* (December 23, 2020), https://www.hino-global.com/corp/for_investors/disclosure/Production%20Pause%20at%20Hino%27s%20North%20America%20Plants.pdf.; https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[42] *See Investigation Results by the Special Investigation Committee – Hino Press Release* (August 2, 2022), https://www.hino-global.com/corp/news/assets/e9e9de2a2a41bb0b5079f138f042b1a3.pdf.

70.     It is also illegal to import or sell engines or vehicles that are not "covered by []

certificate[s] of conformity." *See* 42 U.S.C. § 7522(a)(1). The EPA issued COCs for the Class

Trucks based, in part, on Hino's falsified test results regarding fuel economy and $CO_2$ emissions. In

other words, the COCs were issued for vehicles with different SCR systems and based on falsified

emissions and fuel economy data. The actual Class Trucks were therefore not covered by legitimate

COCs and Executive Orders and were illegal to import or sell.

71.     Hino's fraudulent reporting of its trucks' fuel economy rating and corresponding

$CO_2$ emissions cost Class members thousands of dollars in extra fuel costs over the course of the

trucks' lifespans.  Many Class members are small business owners who use Hino trucks and buses

as an integral part of their livelihood.

### c.     *The Class Trucks contain defective OBD systems that lead to excess emissions and costly, avoidable repairs.*

72.     Diesel engines produce a variety of particles during combustion of the fuel/air mix

due to incomplete combustion. Diesel particulate matter resulting from the incomplete combustion

of diesel fuel produces particulate matter. Particulate matter emissions from diesel engines worsen

the particulate matter pollution in the air, which are harmful to human health and reduce visibility.

73.     A diesel particulate filter ("DPF") is a device designed to remove diesel particulate

matter from the exhaust gas of a diesel engine. Under normal driving conditions, particulate matter

is stored in the DPF, and then are burned off in the DPF during operation at high temperatures or

through the use of a process called "regeneration."

74.     When functioning properly, a DPF burns off excess particles during normal driving.

This often occurs during highway driving, because vehicles achieve the heat necessary to burn off

the particulate matter from the DPF. When vehicles are not driven on the highway for some period

of time, the catalyst does not get hot enough to burn the particulate matter, so it accumulates in the

DPF.

75.     The OBD system is designed and required by law to detect that the filter is clogged

or in danger of imminently becoming clogged. A clogged DPF can result in dangerous pollutants

spewing into the air.  When the vehicle senses the filter is almost clogged, the OBD is supposed to instruct the driver to pull over and idle the vehicle. *See, e.g.*, 13 CCR § 1968.2. When in an idle state, the OBD should then activate the emissions control system so it injects diesel fuel upstream from the filter to heat the filter to burn off the excess particulate matter.

76.    In the Class Trucks, however, this does not happen. The OBD system does not properly alert drivers that the DPF is in danger of being clogged. Therefore, it does not timely instruct drivers to pull over and idle their Class Trucks or initiate the cleaning process in an idle state.

77.    As a result, the Class Trucks' DPFs get clogged far more frequently than they should. When the DPFs get clogged, two things happen. *First*, the toxic particulates that should be burned off are released into the air through the exhaust system and/or increase pressure on the engine, reducing fuel economy, polluting the environment, and damaging other hardware in the Class Trucks. *Second*, the Class Trucks go into an emergency mode that does not permit them to be driven at highway speed. Servicing is then required to unclog the DPF. This often occurs outside of warranty, meaning that Class Members are forced to pay out of pocket for otherwise avoidable repairs.

> **2.    Hino and Toyota knew for years about fraud in connection with the emissions systems and fuel economy performance in the Class Trucks.**

78.    Based on information and belief, Hino's and Toyota's senior management were aware of these frauds well before they both separately admitted, on March 4, 2022, to "identifying potential issues regarding certification testing to determine the emissions performance of on-road engines for the North American market."[43]

---

[43] *Notice Regarding Misconduct concerning Engine Certification – Letter by Hino's President and Board Member Satoshi Ogiso* (March 4, 2022), https://www.hino-global.com/corp/for_investors/disclosure/assets/9279ee7164b8033be06e87497ecf235e.pdf.

79.     As discussed above, in 2016, U.S. regulators reached out to Hino and asked if it had discovered "falsified emissions data."[44] Hino said "no." *Id.* In 2018, U.S. regulators again reached out to Hino, informing Hino that "its trucks aren't up to standard."[45] Hino and Toyota's senior managers were aware of, and involved in, discussions related to the regulators' determination. Finally, and also as discussed above, the U.S. Department of Justice had begun an investigation into Toyota's and Hino's emissions cheating on or around this time. On information and belief, Toyota and Hino senior management were aware of this investigation.

80.     Four years after U.S. regulators questioned Hino's testing and emissions verifications, Hino announced that it would formally pause its vehicle production in North America on December 23, 2020.[46] Based on information and belief, Toyota advised Hino to initiate this pause in light of the Department of Justice investigation. This was not a decision made because U.S. emissions standards had suddenly become too difficult for Hino to meet. Hino for years had not met these standards. The Board made this clear when it announced that the decision to pause production was motivated by changes to the certification testing ***process***, rather than new emissions and fuel efficiency ***standards***. As Hino explained in its letter to investors, "following challenges in the required U.S. engine certification testing ***process*** for new model years of A09C, J08E, and J05E engines for North America,"[47] Hino would suspend vehicle production in the U.S. and Canada and

---

[44] Florin Amerlel, *Toyota's Hino Motors Has Falsified Emission Data Since 2016, Recalls Will Soon Start*, Autorevolution.com (March 6, 2022), https://www.autoevolution.com/news/toyota-s-hino-motors-has-falsified-emissions-data-since-2016-recalls-will-start-soon-183276.html.

[45] Florin Amerlel, *Toyota's Hino Motors Has Falsified Emission Data Since 2016, Recalls Will Soon Start*, Autorevolution.com (March 6, 2022), https://www.autoevolution.com/news/toyota-s-hino-motors-has-falsified-emissions-data-since-2016-recalls-will-start-soon-183276.html.

[46] *Production Pause at Hino's North American Plants – Letter by Hino's President & CEO Yoshio Shimo* (December 23, 2020), https://www.hino-global.com/corp/for_investors/disclosure/Production%20Pause%20at%20Hino%27s%20North%20America%20Plants.pdf (Hino's disclosure communicating this information to its investors states that "the Board of Directors of Hino . . . approved a formal pause of vehicle production at its plants in its consolidated subsidiaries in North America . . . until the end of September 2021." At the time, Hino and Toyota shared a Board member, Mr. Shigeki Terashi).

[47] *Production Pause at Hino's North American Plants – Letter by Hino's President & CEO Yoshio Shimo* (December 23, 2020), *Footnote continued on next page*

postpone sales of 2021 model year vehicles. Initially, Hino forecasted resuming production and sales in October 2021. However, Hino was unable to obtain certification with its own engine systems, and was instead forced to use a competitor engine manufacturer, Cummins Inc., to equip Hino's vehicles in North America.[48]

81.     In other words, Hino knew at least as of 2018 that certain Class Trucks were not compliant with emission and fuel efficiency standards, and was put on notice of potential problems by 2016 at the latest. Based on information and belief, Hino did not inform the EPA, CARB, or its customers that the Class Trucks were not compliant with emission and fuel efficiency standards.

### 3.     Hino—like all vehicle manufacturers—was subject to specific regulations governing fleet-wide $CO_2$ emissions and vehicle-specific $NO_x$ emissions.

82.     Hino cheated on emissions for a reason. As detailed further herein, both emissions and fuel economy are material to consumers and businesses—including Plaintiffs and the Classes. They are also highly regulated.

### a.     *Fleet-wide $CO_2$ regulations*

83.     California, one of the leaders in vehicle emissions regulations, implemented new greenhouse gas regulations in 2006 that took effect in 2009. These regulations, like the federal rules that followed, set a ceiling for a manufacturer's fleet-wide average emissions, and govern all light-, medium-, and heavy-duty vehicles sold in California, one of Hino's biggest markets and partners in the United States.[49]

84.     Federal fleet-wide standards for $CO_2$ emissions and average fuel economy followed suit. New regulations affecting model year 2012-2015 vehicles were implemented in 2011,

---

*Footnote continued from previous page*
https://www.hino-global.com/corp/for_investors/disclosure/Production%20Pause%20at%20Hino%27s%20North%20America%20Plants.pdf.
[48] *Hino Trucks and Cummins Announce Medium and Heavy-Duty Engine Offering* (March 12, 2021): https://www.hino.com/press20210312.html.
[49] *See Hino to Join Hydrogen Demo Study in California Ports – Hino Press Release* (March 9, 2022), https://www.hino.com/press20220309.html.

beginning with 2012 model years, and increased in stringency through model year 2016.[50] New, even more stringent standards went into effect for model year 2017.

85.     The EPA set $CO_2$ emissions standards for light- and heavy-duty vehicles under section 202(a) of the Clean Air Act. Under these standards, by model year 2017, medium-duty vocational diesel vehicles were required to meet an estimated combined average emissions level of 225 grams/mile of $CO_2$. NHTSA set fleet-wide Corporate Average Fuel Economy ("CAFE") standards for vocational diesel vehicles under 49 U.S.C. § 32902. NHTSA's standards required manufacturers to meet an estimated combined average fuel economy level of 22.1 miles per gallon ("MPG") by model year 2017.

86.     Defendants knew that their fleet of vehicles had to meet these standards to be sold in the United States, and were equally aware that fuel consumption (MPG ratings) and emissions are important factors for consumers and businesses choosing a vehicle to purchase or lease. Rather than meeting these standards through legitimate means, however, Defendants cheated on the emissions tests in the Class Trucks to feign compliance and cater to consumer demand. They then misled consumers and businesses by claiming that the Class Trucks consumed less fuel and emitted less $NO_x$, $CO_2$, and other pollutants than they actually do under normal driving conditions.

### b.     *Effect on Fuel Economy Ratings*

87.     Hino's deception had a direct impact on the Class Trucks' fuel economy ratings.

88.     A vehicle's fuel economy is measured by testing as to the time it takes the engine to consume a certain volume of fuel. The EPA sets out clear guidelines on how to measure fuel economy using a dynamometer. As explained above, during the regulatory testing cycles, the engine and transmission are connected to an engine dynamometer, which can be adjusted to simulate a variety of operational conditions. A hose is connected to the tailpipe to collect and measure engine exhaust. The amount of carbon in the exhaust is used to calculate the amount of fuel

---

[50] *See*, *e.g.*, Federal Register Vol. 75 p. 25324 (May 7, 2010), https://www.gpo.gov/fdsys/pkg/FR-2010-05-07/pdf/2010-8159.pdf (summarizing new regulations).

that was burned.[51] Manufacturers calculate the amount of fuel consumed, in part, by measuring the engine's power (speed and torque) in relation to the amount of fuel it has depleted.[52]

89.     Manufactures test their own vehicles in a controlled laboratory setting and report the fuel economy results to the EPA. The EPA reviews the results and confirms about 15-20 percent of them using their own tests.[53]

90.     This gave Hino the opportunity to, as it admitted, alter the fuel flow calibration rate of the dynamometer panel to make it appear that Class Trucks had a higher fuel economy than they actually did.

### c.     *NOx regulations*

91.      $NO_x$ is a dangerous set of pollutants (NO, $NO_2$, etc.) linked with serious health risks and climate change. Congress first began regulating $NO_x$ as a tailpipe emission with the passage of the Clean Air Act in 1970. The standards went into effect in 1975 focusing on NOx emissions of passenger and light-duty cars. In 1990, the CAA was amended to set a higher standard—84 percent reduction—in emissions of all heavy-duty diesel engines effective that same year and a 33 percent reduction in $NO_x$ emissions by 1998.

92.     In 2001, new emissions standards were adopted, requiring a further 90 – 95 percent reduction in emissions by model year 2010. The EPA has since promulgated two phases of Greenhouse Gas ("GHG") standards for medium- and heavy-duty trucks for model years 2014-2027, and which govern most of the Class Trucks. The GHG standards apply in two ways. First, as with $CO_2$ regulations, a manufacturer's entire fleet must not exceed a specific average. Second, each *individual* vehicle must also be certified to emit no more NOx (among other

---

[51] U.S. Department of Energy, *How Vehicles Are Tested*, https://www.fueleconomy.gov/feg/how_tested.shtml.
[52] *See* Federal Register Vol. 81, No. 206 (Oct. 25, 2016) at 74025.
[53] U.S. Department of Energy, *How Vehicles Are Tested*, https://www.fueleconomy.gov/feg/how_tested.shtml.

pollutants) than is legally allowed. For example, the table below demonstrates the useful life emissions standards for model year 2017 vocational vehicles.[54]

**Table 2: MY 2017 Vocational Vehicle Standards**

|  | EPA Full Useful Life Emissions Standards (g CO2/ton-mile) | NHTSA Fuel Consumption Standards (gal/1,000 ton-mile) |
|---|---|---|
| Light Heavy Class 2b-5 | 373 | 36.7 |
| Medium Heavy Class 6-7 | 225 | 22.1 |
| Heavy Heavy Class 8 | 222 | 21.8 |

93.     Hino represented to the U.S. regulators that its vehicles' $NO_x$ emissions did not exceed the limits set by the GHG standard bins to which they were certified. This was false. As a result, the Certificates of Conformity and Executive Orders covering these vehicles were fraudulently obtained, and the vehicles were not legal to sell in the United States.

**B.      Defendants' advertising featured inflated fuel economy ratings, false promises of environmental friendliness, and misrepresentations of high engine performance.**

94.     To many trucking businesses and consumers, including Plaintiffs, fuel economy, engine performance, and environmental friendliness are important factors in their decision to purchase or lease a vehicle. Defendants targeted these preferences in their misleading advertising and other consumer-facing representations and omissions about the Class Trucks.

95.     Defendants advertised the Class Trucks and otherwise supplied consumers and businesses with misinformation about them—misleadingly emphasizing fuel efficiency, environmental cleanliness, and/or engine performance—through various public-facing channels.

96.     Hino advertises itself as a sustainable, environmentally-minded corporation. Its corporate mission is "[t]o make the world a better place to live by helping people and goods get where they need to go—safely, *economically and with environmental responsibility*—while focusing on sustainable development."[55] Hino's Message from the President, Mr. Satoshi Ogiso,

---

[54] EPA Office of Transportation and Air Quality Regulatory Announcement, *EPA and NHTSA Adopt First-Ever Program to Reduce Greenhouse Gas Emissions and Improve Fuel Efficiency of Medium- and Heavy-Duty Vehicles*, EPA-420-F-11-031, https://nepis.epa.gov/Exe/ZyPDF.cgi/P100BOT1.PDF?Dockey=P100BOT1.PDF.

[55] Hino, *Message from the President*, https://www.hino-global.com/corp/about_us/message.html
*Footnote continued on next page*

promised that "Hino is also playing its part to reduce the environmental burden of transportation and logistics, [including by] *reducing environmental impact over the entire vehicle lifecycle.*"[56] Hino even describes its own logo as a symbolization of "the balance between Hino's advanced technologies and the environment." These representations do not reflect reality, in which Hino cheated on emissions standards and sold engines that emitted environmentally-unfriendly amounts of pollutants.

97.     Hino also frequently touts fuel economy. Its website advertises the Hino 268 (one of the Class Trucks with a J08E engine) as "providing the lowest cost of ownership in its class" due to its "outstanding fuel economy."[57] On the same webpage, it goes on to flaunt that "Hino engines deliver dependable, fuel efficient power." After describing its technology, including the SCR system, Hino represents that "[t]he result is fuel-efficient compliance with 2010 EPA regulations."[58]

---

*Footnote continued from previous page*
(emphasis added).

[56] Hino, *Message from the President*, https://www.hino-global.com/corp/about_us/message.html (emphasis added).

[57] *Hino 268 Online Brochure*, https://hino.com/phone/hino-medium-duty-model-268.html.

[58] *Hino 268 Online Brochure*, https://hino.com/phone/hino-medium-duty-model-268.html.




98.     Hino's website boasts that its SCR system "not only meets the EPA 2010 Standards, it produces gains in fuel economy and it does so without the need for carbon credits!"[59]

---

[59] Hino, *Conventional Trucks Overview*,
https://www.hino.com/hino-trucks-conventional.html#overview.



99.     In explaining the performance of its SCR system on its website, Hino claims: "The Urea SCR (use of urea water) reduces exhaust gas emissions. It injects urea water to the exhaust gas to decompose harmful nitrogen oxide into nitrogen and water."[60] Hino's public admissions of emission cheating demonstrate this representation is false, at least with respect to Hino's engines, which were not breaking down "harmful nitrogen oxide" to the extent represented and required by law.

---

[60] *Hino 200 Series Online Brochure*, https://www.hino-global.com/products/trucks/hino200/.



100.    Hino also grossly overstates its environmental initiatives for creating technologies in its vehicles to reduce environmental impact. In an undated brochure highlighting Hino's environmental activities, Hino claims that, "[r]ecognizing that technologies designed to lower fuel consumption can make a significant contribution to reducing $CO_2$ emissions, Hino Motors enhanced the performance of its vehicles with eco-driving technologies that encourage low

fuel-consumption practices by drivers."[61] It goes on to represent that "Hino Motors reduced emissions of NOx and PM [particulate matter] by combining its DPR System that has enhanced PM filtering with its Diesel Exhaust Fluid (DEF) Selective Catalytic Reduction (SCR) system that is designed to reduce NOx to harmless water and nitrogen."[62]



101.    Hino specifically touts its engine performance and fuel economy, including for the A09C, for which it has admitted it falsified its engine performance data "in the measurement of fuel economy performance."[63] Hino makes the same admissions for the J08E and J05E engines, yet its

---

[61] Hino, *Highlights of Environmental Activities: Products that Reduce Environmental Impact – Online Brochure*, https://hino.dga.jp/i-viewer_s/?p_no=3&m_p=4&p_id=300160&file_name=https%3A%2F%2F www.hino-global.com%2Fcorp%2Fcsr%2Fbacknumber%2Fparts%2Fpdf%2F2010%2Fenv_01. pdf&t=Highlights%C2%A0of%C2%A0Environmental%C2%A0Activities%3A&kw=selective+ catalytic+reduction+system.

[62] Hino, *Highlights of Environmental Activities: Products that Reduce Environmental Impact – Online Brochure*, https://hino.dga.jp/i-viewer_s/?p_no=3&m_p=4&p_id=300160&file_name=https%3A%2F%2F www.hino-global.com%2Fcorp%2Fcsr%2Fbacknumber%2Fparts%2Fpdf%2F2010%2Fenv_01. pdf&t=Highlights%C2%A0of%C2%A0Environmental%C2%A0Activities%3A&kw=selective+ catalytic+reduction+system.

[63] *Notice Regarding Misconduct concerning Engine Certification – Letter by Hino's President and Board Member Satoshi Ogiso* (March 4, 2022), https://www.hino-global.com/corp/for_investors/disclosure/assets/9279ee7164b8033be06e87497 ecf235e.pdf.

website represented, and continues to represent, that those engines "maintain optimal power and high fuel economy performance under any driving conditions:[64]



---

# PERFORMANCE

| **ENGINE** | TRANSMISSION | AERODYNAMICS |
|---|---|---|

## ENGINE

High performance mechanical pump and common rail

Reliable mechanical pump is adopted in some specifications. On the other hand, new common rail is adopted in other specifications, which contribute to maintain optimal power and high fuel economy performance under any driving conditions.

| EURO 6 | **EURO 5** | EURO 4 | EURO 3 | EURO 2 |
|---|---|---|---|---|



**A09C-UR**
Displacement：8,866cc
6-cylinder in-line
E/G output(kW/rpm) :
257/1,800 <NET>
E/G torque(N-m/rpm) :
1,422/1,100-1,600
<NET>

**J07E-TN**
Displacement：6,403cc
5-cylinder in-line
E/G output(kW/rpm) :
191/2,400 <NET>
E/G torque(N-m/rpm) :
794/1,500 <NET>



**J08E-VD**
Displacement：7,684cc
6-cylinder in-line
E/G output(kW/rpm) :
206/2,400 <NET>
E/G torque(N-m/rpm) :
824/1,500 <NET>









102.    Furthermore, every Hino press release posted on its website ends by noting that Hino sells "vehicles with low total cost of ownership, superior fuel economy, [and] unmatched reliability."

ABOUT HINO TRUCKS:

Hino Trucks—a Toyota Group Company—assembles, sells, and services a lineup of Class 4-8 diesel commercial trucks in the United States. Hino Trucks is the premier heavy & medium duty nameplate in the United States with a product lineup that offers fully connected vehicles with low total cost of ownership, superior fuel economy, unmatched reliability and maneuverability and the most comprehensive bundle of standard features in the market. Headquartered in Novi, Michigan, Hino has a network of over 230 dealers nationwide committed to achieving excellence in customer service and support. Learn more about Hino Trucks at http://www.hino.com or follow us on Facebook, Twitter and YouTube.

103.    A March 7, 2018 Press Release at the launch of the Hino XL Series represents that "The Hino XL7 and XL8 models are powered by Hino's legendary A09 turbo diesel 8.9-liter inline 6-cylinder engine boasting a B10 life of 1,000,000,000 miles."[65] B10 is a span of time for which Hino's trucks would be expected, as represented, to meet regulatory certifications.

104.    As these and other marketing materials reflect, Hino sought to align its products with businesses that are centered around driving many miles, often hauling heavy loads, and are thus highly conscious of their vehicle's fuel consumption. For these businesses, the fuel efficiency of their trucks and buses can dramatically affect their business margins. Hino also sought to cater to increasingly eco-conscious businesses and consumers and to align its brand—including the Class Trucks—with a commitment to the environment and efficient use of resources. As Hino knows and advertises, for its customers "[e]very delivery makes a difference."[66]



---

[65] *The All-New HINO XL Series: Hino Trucks Enters into Class 8 with Diligence – Hino Press Release* (March 7, 2018), http://www.hmmusa.com/press20180307.html.
[66] Hino (@HINOTRUCKSUSA) Twitter (April 22, 2018), https://twitter.com/HINOTRUCKSUSA.

105.    In an April 27, 2021 press release, Hino expressed its purported commitment to contribute to environmental sustainability: "Hino positions solving environmental issues as an important task for businesses. With the aim of realizing carbon neutrality, we pursue all kinds of measures in collaboration with government and related sectors, to thoroughly reduce $CO_2$ over the entire life cycle from the perspectives of customers and society."[67] It goes on to describe one of its six environmental initiatives, titled the "New Vehicle Zero CO2 Emissions Challenge," assuring that it will improve its diesel engines' fuel efficiency. "Hino will further refine the environmental technology for its diesel engines (including hybrid technologies), which have gained the trust of customers worldwide and represent one of Hino's strengths."[68]

106.    As described throughout this Complaint, these statements and those detailed above about Hino and the Class Trucks' emissions and fuel economy were not true.

* * *

107.    Defendants' deceptive actions harmed Plaintiffs and the Classes. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Trucks were designed to mislead consumers and businesses about their true emissions levels and fuel economy, owners and lessees of the Class Trucks have suffered losses in money and/or property. Plaintiffs did not receive the vehicles they paid for and reasonably expected to receive and, as a result have suffered damages, including but not limited to payment for additional fuel costs required by the reduced fuel economy performance in their Class Trucks.

## VI.    CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"). The Class Trucks implicated by this Complaint include at least all model year 2004–

---

[67] *Hino Environmental Milestone 2030 – Press Release* (April 27, 2021), https://www.hino-global.com/corp/news/2021/20210427-002905.html.
[68] *Hino Environmental Milestone 2030 – Press Release* (April 27, 2021), https://www.hino-global.com/corp/news/2021/20210427-002905.html.

2021 Hino diesel trucks sold in the United States and all 2004 - 2021 Toyota trucks sold in the United States that contain the A05C, A09C, E13C, NO4C, J05D, J05E or J08E diesel engine.

109.     The proposed Nationwide Class includes all persons and entities that purchased or leased a Class Truck in the United States, including its territories.

110.     Plaintiffs also propose separate State Classes for all fifty states, each of which includes all persons and entities that purchased or leased a Class Truck in that state.

111.     Excluded from the Classes are:

     a.     Defendants' officers, directors and employees and participants in the Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; and

     b.     Judicial officers and their immediate family members and associated court staff assigned to this case.

112.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

113.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims. This action may also, in the Court's discretion, be maintained as a class action with respect to particular common issues.

114.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

    A.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

115.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that there are tens of thousands of members of the Class, and multiple members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained

from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

116.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.    Whether Defendants engaged in the conduct alleged herein;

      b.    Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Trucks into the stream of commerce in the United States;

      c.    Whether Defendants owed a duty to disclose accurate emissions and fuel economy performance of the Class Trucks;

      d.    Whether Defendants misrepresented the Class Trucks' emissions and fuel economy;

      e.    Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

      f.    Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

      g.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

**C.    Typicality: Federal Rule of Civil Procedure 23(a)(3)**

117.    Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class member purchased or leased a Class Truck and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same

practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### D.   Adequacy: Federal Rule of Civil Procedure 23(a)(4)

118.   Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle emissions litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### E.   Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

119.   Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### F.   Superiority: Federal Rule of Civil Procedure 23(b)(3)

120.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants such that it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

121.   Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.   Discovery Rule Tolling

122.   For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

123.   Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the Class Trucks' emissions and fuel efficiency levels, including but not limited to their practice of altering the SCR system on test vehicles, secretly manipulating dynamometer results so that the trucks appeared more fuel efficient in testing than they were in the real-world, and falsely attesting that its engines performed better than they actually did.

124.   Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, businesses, or consumers until—at the earliest—March 4, 2022, when Defendants published reports for the first time disclosing the existence of the emissions and fuel economy frauds related to the Class Trucks.

125.   Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions and fuel economy deceptions and that they concealed that information, which Plaintiffs only discovered shortly before this action was filed.

### B.   Tolling Due to Fraudulent Concealment

126.   Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

127.   Upon information and belief, prior to the date of this Complaint, and at least as early as 2018—when U.S. authorities notified Hino that its trucks were not "up to

standard"—Defendants knew of the emissions and fuel economy defects in certain Class Trucks, but continued to allow Plaintiffs and the class members to purchase and drive their Class Trucks. In so doing, Defendants concealed and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Trucks.

128.    Instead of disclosing their deception, or that the emissions and fuel economy from the Class Trucks were worse than represented, Defendants falsely represented the Class Trucks' emissions and fuel economy.

129.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and active concealment of the facts alleged herein.

### C.    **Estoppel**

130.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Trucks, including their fuel economy, emissions systems, and their compliance with applicable federal and state law.

131.    Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants did not disclose accurate fuel economy and emissions statistics and did not correct their misleading disclosures with respect to the Class Trucks, actively concealed the true character, quality, and nature of the Class Trucks, and made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Trucks.

132.    Defendants actively concealed the true character, quality, performance, and nature of the emission and fuel economy defects in the Class Trucks, and Plaintiffs and the class members reasonably relied upon Defendants' knowing and active concealment of these facts.

133.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VIII.   CAUSES OF ACTION

### A.      Claims Asserted on Behalf of the Nationwide Class

**NATIONWIDE COUNT I:
FRAUD BY CONCEALMENT
(Common Law)**

134.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

135.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

136.    Defendants are liable for both fraudulent concealment and nondisclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

137.    Specifically, Defendants committed fraud by submitting testing engines that were materially different from production engines, attesting that the Class Trucks complied with applicable emissions laws, altering the fuel flow rate calibration values to make it appear as though its vehicles were more fuel efficient than they actually were under real-world driving conditions, installing defective hardware and software in the Class Trucks, and concealing all of this information from regulators, Plaintiffs and the Classes.

138.    A reasonable customer would not have expected that the Class Trucks they paid for and drove were materially different from the testing-only trucks used to obtain permission to sell the trucks, did not comply with emissions laws, were less fuel efficient than represented by Hino to regulators, Plaintiffs, and the Classes, and contain defective hardware and software.

139.    Defendants knew that these facts about the Class Trucks would be important to customers deciding to purchase or lease them. Defendants ensured that Plaintiffs and the Class did not discover this information through actively concealing it. Defendants intended for Plaintiffs and the Class to rely on their omissions—which they did by paying for the Class Trucks.

140.    Defendants had a duty to disclose the emissions and fuel economy defects and that the Class Trucks consumed more fuel and emitted higher levels of harmful pollutants during normal driving operation. These important facts were known and/or accessible only to the Defendants,

including due to their involvement in the design, installment, and testing of engines in the Class Trucks. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Classes.

141.    Defendants also had a duty to disclose the true nature of the Class Trucks in light of their affirmative statements about the Class Trucks with respect to emissions standards and fuel efficiency. In uniform advertising and marketing materials provided with each Class Truck, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the Class that the Class Trucks obtained worse fuel economy and/or emitted more pollution on the road than in regulatory testing.

142.    Defendants knew these statements were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the existence of the Emissions and Fuel Economy Scheme. Because they volunteered to provide information about the Class Trucks that they offered for sale to Plaintiffs and the Class, Defendants had the duty to disclose the whole truth. They did not.

143.    Defendants did not fulfill their duties to disclose to Plaintiffs and the Classes. Instead, they actively concealed the truth.

144.    Defendants' deceptive actions harmed Plaintiffs and the Classes. Because Defendants fraudulently concealed the truth about the Class Trucks' fuel economy and emissions characteristics, customers who paid for the Class Trucks suffered economic losses. Plaintiffs suffered damages including but not limited to payment for additional fuel costs required by the lower fuel economy performance in their Class Trucks. Accordingly, Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

145.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**B.**     **Claims Asserted on Behalf of the State-Specific Classes**

**FLORIDA COUNT I:**
**Violations of the Florida Unfair & Deceptive Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(On Behalf of the Florida State Class)**

146.     Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

147.     Plaintiffs Express Freight International and EFI Export & Trading Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

148.     Plaintiffs and members of the Florida State Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

149.     Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

150.     FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

151.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Trucks. Defendants accomplished this by (a) submitting engines for emissions testing that were different from production engines installed in Class Trucks such that they falsely represented fuel consumption and emissions data, and/or (b) falsely attesting that Class Trucks could pass emissions tests when they in fact did not.

152.     Plaintiffs and Florida State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Florida State Class members did not have access to Defendants' emissions certification test engines and Defendants' emissions-related hardware and software was extremely sophisticated technology.

153.    Defendants thus violated the Act by, at minimum: representing that Class Trucks have characteristics, uses, benefits, and qualities which they do not have; representing that Class Trucks are of a particular standard, quality, and grade when they are not; advertising Class Trucks with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Trucks has been supplied in accordance with a previous representation when it has not.

154.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead Plaintiffs and the Florida State Class.

155.    Defendants knew or should have known that their conduct violated the FUDTPA.

156.    Defendants owed Plaintiffs and the Florida State Class a duty to disclose the illegality and public health risks, the true nature of the Class Trucks, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators, Plaintiffs, and Florida State Class members; and/or

C.    made incomplete representations about the Class Trucks' fuel economy and emissions, while purposefully withholding material facts from Plaintiffs and the Florida State Class that contradicted these representations.

157.    Defendants' concealment of the Class Trucks' true fuel consumption and emissions was material to Plaintiffs and the Florida State Class.

158.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Florida State Class, about the true environmental cleanliness and fuel efficiency of the Class Trucks, the quality of the Defendants' brands, and the true value of the Class Trucks.

159.    Defendants' violations present a continuing risk to Plaintiffs and the Florida State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

160.    Plaintiffs and the Florida State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Class Trucks suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

161.    As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs and members of the Florida State Class have suffered injury-in-fact and/or actual damage.

162.    Plaintiffs and the Florida State Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

163.    Plaintiff and the Florida State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT II:**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

164.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

165.    Plaintiffs Express Freight International and EFI Export & Trading Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

166.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

167.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

168.    The Class Trucks are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

169.    In connection with the purchase or lease of each one of their new vehicles, Defendants provide an express base vehicle warranty for a period of two years or unlimited mileage. This warranty exists to repair the vehicle in case of "defects in material and workmanship." Defendants also provide an express base emissions and base after-treatment system warranty for a period of five years and 250,000 miles, whichever occurs first.

170.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

171.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their light-duty trucks through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

172.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

173.     In addition, the EPA mandates vehicle manufacturers to issue general emission-related warranties with respect to all vehicles emission control systems. Thus, Defendants also provide an express warranty for their trucks through 40 C.F.R. § 1037.120. The general emission-related warranty required by the EPA covers the design and manufacture of all parts of the emission control system, ensuring they are free from defect in materials and workmanship. The warranty provides protection for light-duty vehicles for five years or 50,000 miles, whichever comes first. For medium- and heavy-duty vehicles, the warranty provides 5 years or 100,000 miles, whichever comes first.

174.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Trucks.

175.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

176.     Despite the existence of warranties, Defendants failed to inform Plaintiffs and Florida State Class members that the Class Trucks were defectively designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

177.     Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects.

178.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

179.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Florida State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

180.    Accordingly, recovery by Plaintiffs and Florida State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

181.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and Florida State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

182.    Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Florida State Class members' remedies would be insufficient to make them whole.

183.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Florida State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

184.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

185.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Florida State Class members have been damaged in an amount to be determined at trial.

**FLORIDA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Class)**

186.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

187.    Plaintiffs Express Freight International and EFI Export & Trading Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

188.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

189.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

190.    The Class Trucks are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

191.    A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

192.    These Class Trucks, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

193.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Florida State Class members have been damaged in an amount to be proven at trial.

**ARIZONA COUNT I:**
**Violations of the Arizona Consumer Fraud Act**
**Ariz. Rev. Stat. § 44-1521, *et seq.***
**(On Behalf of the Arizona State Class)**

194.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

195.    Plaintiff Redlands Office Cleaning Solutions LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

196.    Defendants, Plaintiff, and Arizona State Class members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

197.    The Class Trucks are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

198.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

199.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Trucks. Defendants accomplished this by (a) submitting engines for emissions testing that were different from production engines installed in Class Trucks such that they falsely represented fuel consumption and emissions data, and/or (b) falsely attesting that Class Trucks could pass emissions tests when they in fact did not.

200.    Plaintiff and Arizona State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Arizona State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

201.    Defendants thus violated the Arizona CFA by, at minimum: representing that Class Trucks have characteristics, uses, benefits, and qualities which they do not have; representing that

Class Trucks are of a particular standard, quality, and grade when they are not; advertising Class Trucks with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Trucks has been supplied in accordance with a previous representation when it has not.

202.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead Plaintiff and the Arizona State Class.

203.    Defendants knew or should have known that their conduct violated the Arizona CFA.

204.    Defendants owed Plaintiff and the Arizona State Class a duty to disclose the illegality and public health risks, the true nature of the Class Trucks, because Defendants:

      A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.    intentionally concealed the foregoing from regulators, Plaintiff, and Arizona State Class members; and/or

      C.    made incomplete representations about the Class Trucks' fuel economy and emissions while purposefully withholding material facts from Plaintiff and Arizona State Class members that contradicted these representations.

205.    Defendants' concealment of the Class Trucks' true fuel consumption and emissions was material to Plaintiff and the Arizona State Class.

206.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Arizona State Class, about the true environmental cleanliness and fuel efficiency of the Class Trucks, the quality of Defendants' brands, and the true value of the Class Trucks.

207.    Plaintiff and the Arizona State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

208.     Plaintiff and the Arizona State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Arizona State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

209.     Plaintiff and the Arizona State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**ARIZONA COUNT II:**
**Breach of Express Warranty**
**Ariz. Rev. Stat. §§ 47-2313 and 47-2A210**
**(On Behalf of the Arizona State Class)**

210.     Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

211.     Plaintiff Redlands Office Cleaning Solutions LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

212.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

213.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

214.     The Class Trucks are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

215.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of two years or unlimited mileage. This warranty exists to repair the vehicle in case of "defects in material and workmanship." Defendants also provide an express base emissions and base after-treatment system warranty for a period of five years and 250,000 miles, whichever occurs first.

216.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

217.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first).

218.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

219.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Trucks.

220.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

221.     Despite the existence of warranties, Defendants failed to inform Plaintiff and Arizona State Class members that the Class Trucks were defective and were defectively designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

58

222.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects.

223.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

224.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Arizona State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

225.    Accordingly, recovery by Plaintiff and Arizona State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

226.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and Arizona State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

227.    Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's Arizona State Class members' remedies would be insufficient to make them whole.

228.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Arizona State Class members assert, as additional and/or alternative remedies, the revocation of

acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

229.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

230.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Arizona State Class members have been damaged in an amount to be determined at trial.

**ARIZONA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ariz. Rev. Stat. §§ 47-2314 and 47-2A212**
**(On Behalf of the Arizona State Class)**

231.     Plaintiffs re-allege and incorporate by reference all allegations of paragraphs 1 through 133 as though fully set forth herein.

232.     Plaintiff Redlands Office Cleaning Solutions LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

233.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

234.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

235.     The Class Trucks are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

236.     A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

237.     These Class Trucks, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions

regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

238. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

239. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arizona State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT I:**
**Violation of California Consumers Legal Remedies Act**
**Cal Bus. & Prof. Code § 1750, _et seq._**
**(On Behalf of the California State Class)**

240. Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

241. Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants for injunctive relief only.

242. Plaintiff and members of the California State Class were deceived by Defendants' failure to disclose that the Class Trucks were materially different from vehicles Defendants used for emissions testing and/or did not comply with emissions regulations when driven and were therefore not fit for the ordinary purpose for which vehicles are used.

243. Defendants engaged in unfair or deceptive acts or practices when, in the course of their business they, among other acts and practices, knowingly made materially incomplete representations as to the characteristics, uses and benefits of the Class Trucks.

244. In the various channels of information through which Defendants sold and marketed Class Trucks, Defendants failed to disclose material information concerning the Class Trucks, which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed above, (a) Defendants knew about the SCR Emissions Fraud in the Class Trucks; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California

State Class members; (c) Defendants actively concealed material facts concerning the emission of the Class Trucks from the general public and Plaintiff and California State Class members; and (d) Defendants made partial representations about the Class Trucks that were misleading because they did not disclose the full truth. As detailed above, Defendants knew the information concerning the defect at the time of advertising and selling the Class Trucks, all of which was intended to induce consumers to purchase the Class Trucks.

245.    Defendants intended for Plaintiff and California State Class members to rely on it to provide adequately designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

246.    Defendants intentionally failed or refused to disclose the defect to consumers.

247.    Defendants' conduct and deceptive omissions were intended to induce Plaintiff and California State Class members to believe that the Class Trucks were adequately designed and adequately manufactured automobiles, meeting regulatory standards.

248.    Defendants' conduct constitutes unfair acts or practices as defined by the California Consumers Legal Remedies Act (the "CLRA").

249.    Plaintiff and the other California State Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions.

250.    Plaintiff and the California State Class seek an order enjoining Defendants' unfair or deceptive acts or practices, equitable relief, and any other just and proper relief available under the CLRA.

251.    Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. Plaintiff has also sent a notice letter to Defendants in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If Defendants fail to do so, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the

Complaint) to include compensatory and monetary damages to which Plaintiff and California Class Members are entitled under the CLRA.

**CALIFORNIA COUNT II:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the California State Class)**

252.   Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

253.   Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

254.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

255.   Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

A.    by knowingly and intentionally concealing from Plaintiff and California State Class members that the Class Trucks suffer from a design defect while obtaining money from the California State Class members;

B.    by marketing Class Trucks as possessing functional and defect-free, EPA-compliant engine systems; and

C.    by knowingly designing and manufacturing the Class Trucks in a manner that they emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and failing to fix the defective emission component free of charge.

256.   Defendants' misrepresentations and omissions alleged herein caused Plaintiff and the California State Class members to make their purchases or leases of their Class Trucks. Absent those misrepresentations and omissions, Plaintiff and California State Class members would not

have purchased or leased these vehicles, would not have purchased or leased these Class Trucks at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have inflated and misleading fuel economy values or issues with exhaust emissions.

257.    Accordingly, Plaintiff and California State Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

258.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to members of the California State Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

**CALIFORNIA COUNT III:**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(On Behalf of the California State Class)**

259.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

260.    Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") bring this claim on behalf of itself and the California State Class against all Defendants.

261.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to  be made or disseminated . . . from this state before the public in any state, in any newspaper or  other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

262.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or

64

misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including California State Class members.

263.    Defendants have violated Section 17500 because the misrepresentations and omissions  regarding the reliability and functionality of Class Trucks as set forth in this Complaint were material and likely to deceive a reasonable consumer.

264.    Plaintiff and the other California State Class members have suffered an injury in fact, including  the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Trucks, the California State Class relied on the misrepresentations and/or omissions of Defendants with respect to the performance and reliability of the Class Trucks. Defendants' representations turned out not to be true because the Class Trucks are distributed with faulty and defective hardware and software systems, rendering certain fuel efficiency and emissions functions unreliable.

265.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated, both in the State of California and nationwide.

266.    The California State Class requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT IV:**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California State Class)**

267.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

268.     Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

269.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

270.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

271.     The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

272.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express base vehicle warranty for a period of two years and unlimited mileage. This warranty exists to repair the vehicle in the case of "defects in material and workmanship." Defendants also provide an express base emissions and base after-treatment system warranty for a period of five years and 250,000 miles, whichever occurs first.

273.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

274.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their light-duty trucks through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer. The EPA requires vehicle manufacturers to issue Design

and Defect Warranties with respect to their light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their light-duty trucks through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

275.    In addition, the EPA mandates vehicle manufacturers to issue general emission-related warranties with respect to all vehicles emission control systems. Thus, Defendants also provide an express warranty for their trucks through 40 C.F.R. § 1037.120. The general emission-related warranty required by the EPA covers the design and manufacture of all parts of the emission control system, ensuring they are free from defect in materials and workmanship. The warranty provides protection for light-duty vehicles for five years or 50,000 miles, whichever comes first. For medium- and heavy-duty vehicles, the warranty provides 5 years or 100,000 miles, whichever comes first.

276.    Defendants were required to provide these warranties to purchasers or lessees of Class Trucks.

277.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

278.    Despite the existence of warranties, Defendants failed to inform Plaintiff and California State Class members that the Class Trucks were defectively designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

279.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects.

280.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

281.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make California State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

282.     Accordingly, recovery by Plaintiff and California State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

283.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. California State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

284.     Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and California State Class members' remedies would be insufficient to make them whole.

285.     Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and California State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

286.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

287.    As a direct and proximate result of Defendants' breach of express warranties, California State Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT V:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On Behalf of the California State Class)**

288.    Plaintiffs re-allege and incorporate by reference all allegations of paragraphs 1 through 133 as though fully set forth herein.

289.     Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

290.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

291.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

292.    The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

293.    A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

294.    These Class Trucks, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

295.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

69

296.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and California State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT VI:**
**Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty**
**Cal Civ. Code § 1790, *et seq.***
**(On Behalf of the California State Class)**

297.     Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

298.     Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

299.      Plaintiff and members of the California State Class who purchased Class Trucks in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

300.     The Class Trucks are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

301.     Defendants are the "manufacturer[s]" of the Class Trucks within the meaning of Cal. Civ. Code § 1791(j).

302.     Defendants impliedly warranted to Plaintiff and the other members of the California State Class that the Class Trucks were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Trucks do not have the quality that a buyer would reasonably expect.

303.     Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.     Pass without objection in the trade under the contract description.

B.     Are fit for the ordinary purposes for which such goods are used.

C.     Are adequately contained, packaged, and labeled.

D.    Conform to the promises or affirmations of fact made on the container or label.

304.    The Class Trucks would not pass without objection in the automotive trade because they share a common design defect in that they were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road, which conceals the vehicles' true emissions and overstates their fuel economy.

305.    Class Trucks are not adequately labeled because the labeling fails to disclose the fact that they are defective.

306.    In the various channels of information through which Defendants sold and marketed Class Trucks, Defendants failed to disclose material information concerning the Class Trucks, which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed above: (a) Defendants knew about the defect; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California State Class members; (c) Defendants actively concealed material facts from the general public and California State Class members concerning the Class Trucks' true emissions and fuel economy; and (d) Defendants made partial representations about the Class Trucks that were misleading because they did not disclose the full truth. As detailed above, Defendants knew the information concerning the defect at the time of advertising and selling the Class Trucks, all of which was intended to induce consumers to purchase the Class Trucks.

307.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Trucks that are defective. Furthermore, this defect has caused members of the California State Class to not receive the benefit of their bargain and have caused the Class Trucks to depreciate in value.

308.    Plaintiff and members of the California State Class have been damaged as a result of the diminished value of Defendants' products.

309.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks.

310.    Under Cal. Civ. Code § 1794, Plaintiff and the other members of the California State Class are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VII:**
**Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
**Cal Civ. Code § 1790, *et seq.***
**(On Behalf of the California State Class)**

311.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

312.    Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

313.     Plaintiff and Members of the California State Class who purchased or leased the Class Trucks in California are "buyers" within the meaning of California Civil Code § 1791(b).

314.    The Class Trucks are "consumer goods" within the meaning of California Civil Code § 1791(a).

315.    Defendants are "manufacturer[s]" of the Class Trucks within the meaning of California Civil Code § 1791(j).

316.    Defendants made express warranties to members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

317.    As set forth above in detail, the Class Trucks are inherently defective in that they were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road. This defect substantially impairs the use and value of the Class Trucks to reasonable consumers.

318.     As a result of Defendants' breach of their express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiff and the other members of the California State Class. Plaintiff and members of the California State Class have been damaged as a result of, *inter alia*, the diminished value of Defendants' products.

319.     Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiff and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks.

320.     Pursuant to California Civil Code § 1794, the Class is entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VIII:**
**Breach of Express California Emissions Warranties**
**Cal. Civ. Code § 1793.2, *et seq.***
**(On Behalf of the California State Class)**

321.     Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

322.     Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

323.     Each Class Truck is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

324.     The express California Emissions Warranties generally provide "that the vehicle or engine is . . . [d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id*. This provision applies without any time or mileage limitation. *See id*.

325.     The California Emissions Warranties also specifically warrant consumers of light- and medium duty vehicles against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part

73

for seven years or 70,000 miles, whichever occurs first. *See id*. The California Emissions Warranties also specifically warrant consumers of diesel-powered heavy-duty vehicles against any defect in any emission-related part for five years or 100,000 miles, whichever occurs first. Cal. Code Regs. tit. 13, § 2036.

326.     California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

327.     Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

328.     Plaintiff and Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Defendants are refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

329.     This Complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id.*

330.     Plaintiff and California State Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because Hino has no ability to do so at this time.

331.     In addition to all other damages and remedies, California State Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1).

### CALIFORNIA COUNT IX:
### Failure to Recall/Retrofit
### (On Behalf of the California State Class)

332.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

333.    Plaintiff Redlands Office Cleaning Solutions, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

334.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Trucks, as set forth above.

335.    Defendants knew or reasonably should have known that the Class Trucks emit a substantially increased amount of pollution and reasonably should have known that the Class Trucks were likely to be dangerous when used in a reasonably foreseeable manner.

336.    Defendants failed to recall the Class Trucks in a timely manner or warn of the Class Trucks' heightened emissions.

337.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Trucks.

338.    Plaintiff and California State Class members were harmed by Defendants' failure to recall the Class Trucks properly and in a timely manner and, as a result, have suffered damages, caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Class Trucks. Defendants' failure to timely recall the Class Trucks was a substantial factor in causing harm to Plaintiff and California State Class members as alleged herein.

### CONNECTICUT COUNT I:
### Violations of Connecticut Unlawful Trade Practice Act
### Conn. Gen. Stat. § 42-110a, *et seq.*
### (On Behalf of the Connecticut State Class)

339.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

340.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Connecticut State Class against all Defendants.

341.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

342.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

343.    Defendants engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

344.    Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein.

345.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Trucks. Defendants accomplished this by (a) submitting engines for emissions testing that were different from production engines installed in Class Trucks such that they falsely represented fuel consumption and emissions data, and/or (b) falsely attesting that Class Trucks could pass emissions tests when they in fact did not.

346.    Plaintiff and Connecticut State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Connecticut State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

347.    Defendants thus violated the Connecticut UTPA by, at minimum: representing that Class Trucks have characteristics, uses, benefits, and qualities which they do not have; representing that Class Trucks are of a particular standard, quality, and grade when they are not; advertising Class Trucks with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Trucks has been supplied in accordance with a previous representation when it has not.

348.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead Plaintiff and the Connecticut State Class.

349.    Defendants knew or should have known that their conduct violated the Connecticut UTPA.

350.    Defendants owed Plaintiff and the Connecticut State Class a duty to disclose the illegality and public health risks, the true nature of the Class Trucks, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators, Plaintiff, and Connecticut State Class members; and/or

C.    made incomplete representations about the Class Trucks' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

351.    Defendants' concealment of the Class Trucks' true fuel consumption and emissions was material to Plaintiff and the Connecticut State Class.

352.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Connecticut State Class, about the true environmental cleanliness and fuel efficiency of the Class Trucks, the quality of the Defendants' brands, and the true value of the Class Trucks.

353.    Plaintiff and the Connecticut State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

354.    Plaintiff and the Connecticut State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Connecticut State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

355.    Plaintiff and the Connecticut State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Connecticut CFA.

356.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Connecticut UTPA. All owners of Class Trucks suffered

77

ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

357.    Defendants' violations present a continuing risk to Plaintiff and the Connecticut State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

358.    As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiff and the Connecticut State Class have suffered injury-in-fact and/or actual damage.

359.    Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g. Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**CONNECTICUT COUNT II:**
**Breach of Express Warranty**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut State Class)**

360.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

361.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Connecticut State Class against all Defendants.

362.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

363.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of two years or unlimited mileage. This warranty exists to repair the vehicle in case of "defects in material and workmanship." Defendants also provide an express base emissions and base after-treatment system warranty for a period of five years and 250,000 miles, whichever occurs first.

364. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

365. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first).

366. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

367. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Trucks.

368. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

369. Despite the existence of warranties, Defendants failed to inform Plaintiff and Connecticut State Class members that the Class Trucks were defective and were defectively designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

370.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects.

371.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

372.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Connecticut State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

373.    Accordingly, recovery by Plaintiff and Connecticut State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

374.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and Connecticut State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

375.    Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and Connecticut State Class members' remedies would be insufficient to make them whole.

376.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Connecticut State Class members assert, as additional and/or alternative remedies, the revocation

of acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

377.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

378.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Connecticut State Class members have been damaged in an amount to be determined at trial.

**CONNECTICUT COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Conn. Gen. Stat. Ann. § 42A-2-314**
**(On Behalf of the Connecticut State Class)**

379.    Plaintiffs re-allege and incorporate by reference all allegations of paragraphs 1 through 133 as though fully set forth herein.

380.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Connecticut State Class against all Defendants.

381.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

382.    A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

383.    These Class Trucks, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

384.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

385. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Connecticut State Class members have been damaged in an amount to be proven at trial.

**NEW YORK COUNT I:**
**Violations of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York State Class)**

386. Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

387. Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

388. Plaintiff and the New York State Class members and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

389. Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

390. The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

391. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Trucks. Defendants accomplished this by (a) submitting engines for emissions testing that were different from production engines installed in Class Trucks such that they falsely represented fuel consumption and emissions data, and/or (b) falsely attesting that Class Trucks could pass emissions tests when they in fact did not.

392. Plaintiff and New York State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and New York State Class members did not have access to Defendants' emissions certification test engines and Defendants' emissions-related hardware and software was extremely sophisticated technology.

393.     Defendants thus violated the Act by, at minimum: representing that Class Trucks have characteristics, uses, benefits, and qualities which they do not have; representing that Class Trucks are of a particular standard, quality, and grade when they are not; advertising Class Trucks with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Trucks has been supplied in accordance with a previous representation when it has not.

394.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead the New York State Class.

395.     Defendants knew or should have known that their conduct violated the NY DAPA.

396.     Defendants owed the New York State Class a duty to disclose the illegality and public health risks, the true nature of the Class Trucks, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and New York State Class members; and/or

C.     made incomplete representations about the Class Trucks' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

397.     Defendants' concealment of the true characteristics of the Class Trucks' true fuel consumption and emissions was material to the New York State Class.

398.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the true environmental cleanliness and fuel efficiency of the Class Trucks, the quality of the Defendants' brands, and the true value of the Class Trucks.

399.     Defendants' violations present a continuing risk to Plaintiff and the New York State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

400. Plaintiff and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of Class Trucks suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

401. As a direct and proximate result of Defendants' violations of the NY DAPA, Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damage.

402. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff and New York State Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT II:**
**Violations of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York State Class)**

403. Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

404. Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

405. Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

406. The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into

account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

407.    Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiff and the New York State Class.

408.    Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Trucks, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Class Trucks. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Class Trucks to intentionally and grossly defraud and mislead the New York State Class concerning the true emissions produced by the Class Trucks.

409.    The misrepresentations and omissions regarding fuel economy and emissions set forth above were material and likely to deceive a reasonable consumer.

410.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead Plaintiff and the New York State Class.

411.    Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the illegality and true characteristics of the Class Trucks, the quality of Defendants brand and the true value of the Class Trucks.

412.     Defendants' violations of the NY FAA present a continuing risk to Plaintiff and New York State Class members and to the general public. Defendants' deceptive acts and practices affect the public interest.

413.    The Class Trucks do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

414.    Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's false advertising in violation of the NY FAA.

415.    Plaintiff and the New York State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class members. Because Defendants' conduct was committed willingly and knowingly, New York State Class members are entitled to recover three times actual damages, up to $10,000.

416.    The New York State Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**NEW YORK COUNT III:**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On Behalf of the New York State Class)**

417.    Plaintiffs incorporate by reference paragraphs 1 through 133 as though fully set forth herein.

418.     Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

419.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

420.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

421.    The Class Trucks are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

422.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express base vehicle warranty for a period of two years and unlimited mileage. This warranty exists to repair the vehicle in the case of "defects in material and workmanship."

Defendants also provide an express base emissions and base aftertreatment system warranty for a period of five years and 250,000 miles, whichever occurs first.

423.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

424.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their light-duty trucks through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

425.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their light-duty trucks' emission systems. Thus, Defendants also provide an express warranty for their light-duty trucks through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

426.    In addition, the EPA mandates vehicle manufacturers to issue general emission-related warranties with respect to all vehicles emission control systems. Thus, Defendants also provide an express warranty for their trucks through 40 C.F.R. § 1037.120. The general emission-related warranty required by the EPA covers the design and manufacture of all parts of the emission control system, ensuring they are free from defect in materials and workmanship. The

warranty provides protection for light-duty vehicles for five years or 50,000 miles, whichever comes first. For medium- and heavy-duty vehicles, the warranty provides 5 years or 100,000 miles, whichever comes first.

427.   Defendants were required to provide these warranties to purchasers or lessees of Class Trucks.

428.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

429.   Despite the existence of warranties, Defendants failed to inform Plaintiff and New York State Class members that the Class Trucks were defectively designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

430.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects.

431.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

432.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and New York State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

433.   Accordingly, recovery by Plaintiff and New York State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

434.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not

conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and New York State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

435.    Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and New York State Class members' remedies would be insufficient to make them whole.

436.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and New York State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

437.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

438.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and New York State Class members have been damaged in an amount to be determined at trial.

**NEW YORK COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On Behalf of the New York State Class)**

439.    Plaintiffs re-allege and incorporate by reference all allegations of paragraphs 1 through 133 as though fully set forth herein.

440.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

441.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

442.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

443.    The Class Trucks are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

444.    A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

445.    These Class Trucks, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

446.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and New York State Class members have been damaged in an amount to be proven at trial.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and all Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.    Relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses resulted from the inaccurate fuel

economy disclosures, as well as any other consequential damages suffered as a result of the false fuel economy statistics;

C.     A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

D.     Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

E.     Rescission of all Class Truck purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Trucks, including taxes, licenses, and other fees.

F.     Any and applicable statutory and civil penalties;

G.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded.

H.     An award of costs and attorneys' fees, as allowed by law;

I.     Leave to amend this Complaint to conform to the evidence produced at trial; and

J.     Such other or further relief as the Court may deem appropriate, just, and equitable.

X.      **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

and all issues in this action so triable of right.

Dated: August 5, 2022            Respectfully submitted,

By: */s/ Peter Prieto*

Peter Prieto (FBN 501492)
Matthew P. Weinshall (FBN 84783)
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Ave, Suite 2300
Miami, Florida 33131
Telephone: 305-358-2800
Facsimile: 305-358-2382
E-mail: pprieto@podhurst.com
E-mail: mweinshall@podhurst.com

David S. Stellings (NY State Bar No. 2635282)
*Pro-hac vice forthcoming*
Wilson M. Dunlavey (CA State Bar No. 307719)
*Pro-hac vice forthcoming*
Kara I. McBride (NY State Bar No. 5452388)
*Pro-hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
E-mail: dstellings@lchb.com
E-mail: wdunlavey@lchb.com
E-mail: kmcbride@lchb.com

Elizabeth J. Cabraser (CA Bar No. 083151)
*Pro-hac vice forthcoming*
Kevin Budner (CA Bar No. 287271)
*Pro-hac vice forthcoming*
Phong-Chau G. Nguyen (CA State Bar No. 286789)
*Pro-hac vice forthcoming*
Amelia A. Haselkorn (CA State Bar No. 339633)
*Pro-hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
E-mail: ecabraser@lchb.com
E-mail: kbudner@lchb.com
E-mail: pgnguyen@lchb.com
E-mail: ahaselkorn@lchb.com

Roland Tellis (CA State Bar No. 186269)
*Pro-hac vice forthcoming*
David Fernandes (CA State Bar No. 280944)
*Pro-hac vice forthcoming*
Adam Tamburelli (CA State Bar No. 301902)
*Pro-hac vice forthcoming*
Shannon Royster (CA State Bar No. 314126)
*Pro-hac vice forthcoming*
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 818.986.9698
E-mail: rtellis@baronbudd.com
E-mail: dfernandes@baronbudd.com
E-mail: atamburelli@baronbudd.com
E-mail: sroyster@baronbudd.com